In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-01-00122-CR


______________________________




TODD MICHAEL DUREN, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 202nd Judicial District Court


Bowie County, Texas


Trial Court No. 00-F-519-202




 




Before Morriss, C.J., Grant and Ross, JJ.


Opinion by Justice Grant



O P I N I O N



 Todd Michael Duren appeals his conviction and mandatory life sentence for capital murder
of a child. He was convicted of knowingly causing the death of Damon Chamless, a child under the
age of six, by inflicting severe blunt trauma to the child's head. 

 Duren contends that the evidence was legally and factually insufficient to support the jury's
verdict, that the trial court erred in admitting evidence of a prior extraneous offense, that his sentence
violates the Eighth Amendment to the United States Constitution, and that he received ineffective
assistance of counsel. 

 The following facts are uncontested and supported by testimony. At the time of the incident,
Duren lived with his girlfriend, Michelle Chamless, and her two young children, three-year-old
Damon and ten-month-old Kaitlin. On February 14, 2000, Duren was watching the children at home
after having taken Michelle to work. Duren called Michelle at work, telling her she needed to go to
the hospital because Damon had hurt himself falling off his bunk bed, the same story he told to the
9-1-1 operator, the fire chiefs who responded to the 9-1-1 call, and the criminal investigator who
later interviewed Duren at his home. The first fire chief to arrive on the scene found Damon
facedown on the kitchen's hard floor, unconscious and not breathing properly. Suspecting child
abuse, the chief contacted the sheriff's department.

 Damon was taken to the hospital in Texarkana and then transported to a hospital in
Little Rock, where neurosurgeons performed an emergency craniotomy. Damon had sustained a
severe trauma force to the head and had multiple external bruises on his body, consistent with
impacting a hard surface and being forcefully grabbed. Damon suffered brain death and died the
next day from the blunt force head trauma.

 Facts regarding how the injury was inflicted are in dispute. At trial, Duren testified Damon
was injured while Damon and he were wrestling. Duren imitated a wrestling move he had seen on
television on Damon, aiming for a padded chair, but he dropped Damon, causing Damon's head to
strike the floor instead. Duren testified Damon started to get up, but then collapsed unconscious, at
which time Duren began to shake him to rouse him, to no avail. Duren testified he often "hung out"
with Damon and watched wrestling on television, and the two would engage in their own wrestling
matches. The State called several expert witnesses who suggested that due to the extent of the
injuries, Damon's injuries could not have been caused by playful rough housing, being tossed from
a few feet up in the air, or from falling from an insignificant height, because tremendous force was
required.

Legal Sufficiency of the Evidence

 Duren contends the evidence was legally insufficient to prove the mens rea element of capital
murder of a child. Because Duren claims the evidence is insufficient to prove the elements of the
offense, he is asserting his federal constitutional due process rights. Such claims are reviewed by
measuring evidentiary sufficiency against the "substantive elements of the criminal offense as
defined by state law." See Fuller v. State, 73 S.W.3d 250, 252 (Tex. Crim. App. 2002). 

 In conducting a legal sufficiency review, we view the evidence in the light most favorable
to the prosecution and ask if any reasonable trier of fact could have found the essential elements of
the crime beyond a reasonable doubt. Fuentes v. State, 991 S.W.2d 267, 271 (Tex. Crim. App.
1999). Because in a jury trial the jury serves as the exclusive judge of the credibility of witnesses
and of the weight to be given their testimony, the jury is free to accept or reject any or all of any
witness's testimony and reconcile any conflicts in the evidence. Id. In reviewing the evidence for
legal sufficiency, the court must presume the trier of fact resolved any conflicting inferences in favor
of the prosecution and must defer to that resolution. Turro v. State, 867 S.W.2d 43, 47 (Tex. Crim.
App. 1993). The fact-finder may use common sense and apply common knowledge, observation,
and experience gained in the ordinary affairs of life when giving effect to the inferences that may
reasonably be drawn from the evidence and may infer knowledge or intent from the acts, words, and
conduct of the accused. See Manrique v. State, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999)
(Meyers, J. concurring); Wawrykow v. State, 866 S.W.2d 87, 88-89 (Tex. App.-Beaumont 1993, pet.
ref'd).

 The capital murder of a child statute provides that an offender who intentionally or
knowingly causes the death of an individual shall bear the risk of a capital murder conviction if the
victim is under six years of age. See Tex. Pen. Code Ann. §§ 19.02(b)(1) & 19.03(a)(8) (Vernon
1994). Under the indictment and jury charge of this case, the facts required to support Duren's
conviction for capital murder of a child are on February 14, 2000, Todd Michael Duren knowingly
caused the death of an individual, Damon Chamless, under six years of age, by inflicting trauma to
the head of the victim. See id. Duren admitted causing Damon's injuries. Both Duren and the State
agree that the only element in dispute is whether Duren acted knowingly when he inflicted the
trauma to Damon's head. The facts regarding how Duren inflicted the injuries, what physically took
place, are also in dispute. 

 Under the Penal Code, "[a] person acts knowingly, or with knowledge, with respect to a
result of his conduct when he is aware that his conduct is reasonably certain to cause the result."
Tex. Pen. Code Ann. § 6.03(b) (Vernon 1994). Mental culpability generally must be inferred from
circumstances of the act. Hernandez v. State, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991). The
requisite mental state to commit capital murder can be inferred from acts, words, and conduct of an
accused, as well as from any facts in evidence which, to the jurors' minds, prove the existence of
knowing conduct or an intent to kill. Patrick v. State, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). 
A defendant's mental state may be inferred from the extent of injury and the relative size and strength
of the parties. Id. 

 The jury heard testimony indicating that Duren had told conflicting stories regarding how
Damon's injuries occurred. The jury heard testimony that Duren knew a child must wear a helmet
while riding a bicycle. The jury heard testimony regarding the height and weight disparity between
Duren (6', 175 lbs.) and Damon (3' 4 1/2", 37 lbs.). The jury also heard the testimony of the fire
chiefs responding to Duren's 9-1-1 call that Damon was found facedown in the kitchen, that Duren
was slow in providing answers to their repeated questions regarding how the injuries occurred, that
they found the circumstances around Damon's injuries a little strange, thought the incident needed
to be investigated, and suspected child abuse. 

 The jury heard Duren's testimony that he was capable of losing his temper, that he had argued
with Michelle Chamless, she had slapped him and he had slapped her back, and that before wrestling
with Damon, Duren had talked with Michelle on the telephone and they had a disagreement. The
jury also heard Duren testify that he did not know it would be wrong for anybody to take a child's
head and strike it with great force on any object, but that it would be wrong to throw a baby.

 Dr. Charles James, a radiologist, testified that he had frequently seen injuries like Damon's
and that the injuries were not caused by a mild bump, but by a severe trauma force to the head, either
a severe direct blow or severe shake, such as he had seen in severe car wrecks, or a patient thrown
from or kicked in the head by a horse. Dr. James said that injuries such as Damon's could occur from
being thrown high up into the air and landing on a concrete surface, but that it would be very unlikely
such injuries could be sustained from being thrown in the air inside a house with eight-foot ceilings
and landing on carpet. He said he has seen children playing, roughhousing, and tumbling, and it is
uncommon to see this degree of injury from those instances.

 Dr. Mark Linskey, a neurosurgeon who treated Damon, testified that the constellation of
Damon's injuries was not consistent with a fall from a small height or exuberant roughhousing, but
rather was the kind of injury he had seen in high-speed automobile accidents, a fall from a height of
several stories, or in children who had been shaken or who had suffered blows to the head combined
with shaking. Dr. Linskey testified the constellation of injuries could not all result from a fall
combined with resuscitative shaking. However, he agreed it would be possible, although highly
unlikely, that tossing a child in the air and the child landing on a very hard surface could cause
hematomas as severe as Damon's, if you threw the child into the air hard enough and the child landed
directly on his or her head. Although he agreed the retinal hemorrhages could have been produced
by an effort to resuscitate, he emphasized one would have to be imparting a very severe force, or
over-vigorously shaking another, because "[t]his is not something that, 'Honey, Honey, are you
awake,' will cause." Dr. Linskey said the fall and subsequent shaking would not account for the
multiple bruises of multiple ages on the body.

 Dr. Jennie Duval, the medical examiner who performed the autopsy on Damon's body,
testified there were recent and contemporary bruises on the back and left side of the head, the upper
arms, the back along the spine and near the buttocks, as well as a number of internal injuries mainly
related to the blunt force head trauma. In explaining how the constellation of bruises related to the
infliction of the blunt force trauma, Dr. Duval explained that one does not just land on the head, one
lands on the back, the back of the arms, the back of the head, the back of the neck, and the back of
the shoulders.

 Dr. Duval testified lethal head injuries are not seen in trivial falls in the home, but from
motor vehicle accidents where children are occupants or have been struck by motor vehicles, where
children fall from a great height (at least twenty feet), or where a very heavy object falls on the child. 
She stated she had been unable to find a case of a child falling from a trivial height, whether from
being tossed in the air or falling off a bed, where the child died of lethal head injuries. She concluded
that the manner in which the injuries were inflicted was not accidental. 

 Dr. Duval stated she did not believe it would be possible for Damon's level of trauma to be
sustained by a father tossing a child in the air and the child's head landing on a hard surface. She did
state that if the father vaulted the child like a football onto the pavement, then it would be possible
to sustain such injuries. Stating that the bruises could not have been inflicted as the result of
wrestling or playful roughhousing, she added, "If you want to call picking up a child and throwing
him against a hard surface a wrestling move, then I'll say yes, a wrestling move can cause this."

 Dr. Duval, after stating that even inexperienced individuals attempting to rouse someone by
shaking would not cause Damon's type of injury and, distinguishing such shaking from vigorous
shaking, stated she did not have evidence of shaking, or just shaking, but of impact to the back, arms,
and scalp, of the child being slammed against a hard surface. She conceded that Damon may have
been shaken and that the bruises on Damon's left shoulder could be accounted for by someone
holding the child during a shaking event. She also stated that children do not tend to bruise on the
upper arms, that those kinds of bruises are typical of grab marks where a child has been grabbed
forcefully, that they are fingertip marks. She said the bruises on the elbow would be consistent with
a child being grabbed or striking a hard surface. She also said the bruise on the buttock was not
caused by shaking, but by impact with a hard surface. 

 Duren argues the jury would be unable to base its verdict on the inferences made by Dr. Mark
Linskey that Duren had inflicted bruises on Damon before the instant offense, and because Duren
had caused prior bruising, he intended to or knowingly hurt Damon on the date in question. Duren
argues the doctor's assumption that Duren had inflicted the prior bruises was speculation. See Reese
v. State, 653 S.W.2d 550, 553 (Tex. App.-Beaumont 1983, no pet.) (jury may not reach verdict
based on speculation).

 Even without considering Dr. Linskey's testimony, which Duren argues is based in part on
the inference that Duren had inflicted previous bruises on Damon, the doctors' testimony regarding
the extent of injury, Dr. Duval's testimony regarding the force necessary to inflict the injuries Damon
sustained, her conclusion that such injuries could not have been inflicted by accident while
roughhousing or due to a trivial fall at home, Duren's inconsistent stories, and the disparity between
Duren's and Damon's size and strength combine to support the reasonable inference that Duren knew
his conduct was reasonably certain to cause death. The jury was free to reconcile any conflicting
testimony regarding the amount of force required to inflict Damon's injuries in favor of such
testimony that suggested such enormous force was required that anyone inflicting such force on a
child must know that death is reasonably certain to result. Therefore, the jury was free to believe that
Duren was aware that death was reasonably certain to result. The evidence is legally sufficient to
sustain the jury's verdict. This point is overruled. 

Factual Sufficiency of the Evidence

 Duren also contends the evidence was factually insufficient to prove the mens rea element
of capital murder of a child. 

 In a factual sufficiency review, viewing the evidence both for and against the finding of guilt
in a neutral light, we determine if the evidence demonstrates that the proof of guilt is so obviously
weak as to undermine confidence in the jury's determination and be clearly wrong and manifestly
unjust, or whether the verdict is against the great weight and preponderance of the available
evidence. Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). Unless the available record
clearly reveals a different result is appropriate, we must defer to the jury's factual determinations and
presume the trier of fact resolved any conflict in the evidence in favor of the prosecution and regard
the fact-finder's verdict on such matters as conclusive. Id. at 8. 

 In addition to the evidence discussed above, we consider the following evidence. Duren
testified Damon sustained the blunt force trauma to his head when he caused Damon's head to hit
the floor while they were wrestling. Duren testified he carried Damon into the kitchen, where the
telephone was, laid Damon on the kitchen floor facedown because he did not want to put pressure
on the bump on the back of Damon's head, and called 9-1-1. Duren said that when he was asked
how the child fell, he was afraid and nervous and, remembering Damon had previously jumped off
the bunk bed, said that Damon had fallen from the bunk bed. Duren testified that at the time he was
wrestling with Damon, he did not know it was wrong or that it was going to fatally harm Damon and
that he did not intend to harm Damon and did not do so knowingly. Duren testified he had never
struck a child out of anger or struck a child knowing he was going to harm that child.

 Michelle Chamless, Damon's mother, testified Duren got along well with her children, would
play with them, and would wrestle with Damon, "mostly a lot of tickling and just rolling off and stuff
like that," while watching wrestling on television. Dr. Mary Weatherby, an expert in psychology,
testified she evaluated Duren to determine if he were insane at the time of the alleged offense and
concluded that he did not know his conduct was wrong or that it would kill the child because,
although she did not give him a specific diagnosis, she found he exhibited deficits in the areas of
social judgment, practical and verbal reasoning, and verbal concept formation, and he was therefore
suffering from a severe mental defect. Both Duren and his father testified that Duren was "slow." 
Ten witnesses, Duren's friends and family, testified Duren had a good reputation for being peaceful
and nonviolent toward children and expressed their opinions that he would not knowingly harm a
child, that he does not "cause any kind of trouble," that he is "quiet and mellow," and that he "never
tries to start anything."

 Viewing the evidence in a neutral light, the verdict is not against the great weight and
preponderance of the available evidence. This point of error is overruled.


Prior Extraneous Offense

 Duren contends the trial court erred in admitting evidence of a prior extraneous crime, wrong,
or act because such act was not relevant to any issue and constituted impermissible character
evidence. He argues that the extraneous act was too dissimilar to the indicted offense to be relevant
to a permissible purpose under Tex. R. Evid. 404(b) and further argues that the extraneous act
exceeded the scope of permissible cross-examination regarding his character because the pertinent
character trait was limited to his character for violence toward children. 

 The State argues Duren did not preserve error because the trial court never made a definitive
ruling either sustaining or overruling Duren's objection and because Duren's objection does not
comport with his point of error on appeal. The State argues that Duren's trial objection did not assert
that the evidence was inadmissible character conformity evidence or that it was inadmissible rebuttal
evidence because of dissimilarity between the extraneous bad act and the charged offense. 

 To properly preserve error with regard to inadmissible extraneous act evidence, a defendant
must have made a timely request, objection, or motion stating the grounds for exclusion with
sufficient specificity to make the trial court aware of the nature of the complaint and secured a ruling.
Tex. R. App. P. 33.1(a); see Thomas v. State, 1 S.W.3d 138, 143 (Tex. App.-Texarkana 1999, pet.
ref'd). The objection raised on appeal must be the same as the one raised at trial. Brasfield v. State,
30 S.W.3d 502, 505 (Tex. App.-Texarkana 2000, no pet.). Where a trial objection does not comport
with the issue raised on appeal, error is not preserved for review and is waived. Id. 

 Duren objected, "This is not relevant. We've never been given notice of any extraneous
offense." Without any discussion from the parties regarding the objection, the trial judge responded,
"I think he opened the door as to whether or not there's any violence connected with him, and I think
that's in response to this. If it's argumentative only, it's not admissible. If it's a contact matter, it is." 

 The trial court responded to both of Duren's objections. According to the language of Texas
Rule of Evidence 404(b), the notice requirement does not apply to extraneous act character evidence
introduced by the State on cross-examination or on rebuttal, only to that evidence the State intended
to introduce in its case-in-chief. Therefore, the trial court implicitly ruled on Duren's objection
regarding the State's failure to provide notice by recognizing that the State was introducing the
extraneous act to rebut evidence offered by the defense. The trial court also implicitly ruled on
Duren's objection to relevance by stating that the extraneous act would not be admissible if the
extraneous act was limited to an argument, but that it would be admissible if it involved contact. The
core of Duren's argument on appeal rests on his objection that the extraneous-act evidence was too
dissimilar to be relevant to anything other than his character and that it was not relevant to the
pertinent character trait at issue, violence toward children. The trial court demonstrated an
understanding of Duren's relevance objection by attempting to define the scope within which an
extraneous act would be relevant, but did not state on which grounds the court determined that scope. 
We find that Duren preserved this issue for review. 

 A trial court has considerable discretion in determining whether to exclude or admit
evidence. Montgomery v. State, 810 S.W.2d 372, 379 (Tex. Crim. App. 1990) (op. on reh'g). The
standard of review regarding the trial court's evidentiary rulings is abuse of discretion. Long v. State,
10 S.W.3d 389, 396 (Tex. App.-Texarkana 2000, pet. ref'd). An abuse of discretion occurs only
when the trial court acts arbitrarily or unreasonably without reference to any guiding rules or
principles. Montgomery, 810 S.W.2d at 380. The court must uphold a trial court's ruling if there is
any legitimate ground for doing so. Metts v. State, 22 S.W.3d 544, 550 (Tex. App.-Fort Worth
2000, no pet.). 

 Duren contends the State's cross-examination of him regarding the extraneous act involving
an argument that took place in a Wal-Mart Store was not relevant and therefore improper. He argues
the extraneous act was too dissimilar to the indicted offense to be relevant to a permissible purpose
under Rule 404(b). He further argues that cross-examination of the extraneous act exceeded the
scope of permissible cross-examination on the issue of his character toward violence because the
defense witnesses' testimony pertained only to his character for nonviolence regarding children and
the extraneous act evidence focused on his general character for violence. 

 The State argues the defense opened the door to cross-examination of extraneous acts by
presenting witnesses who testified to Duren's good, peaceful, law-abiding, and nonviolent character. 
The State argues that it was entitled to correct the false impression Duren's witnesses created
regarding his character and rebut the defensive theory that because Duren is a peaceful, law-abiding,
nonviolent person, he acted in conformity with that character on the day he inflicted the fatal head
trauma on Damon. 

 The cross-examination in question proceeded as follows:

 Q. And as a matter of fact, you've laid your hands on other people before
when you got mad, haven't you, sir?


 A. (No response.)


 Q. Atlanta? Star Neville?


 A. I never hit her.


 Q. Weren't the police called to Wal-Mart, sir, as a result of your arguing
with Star Neville?


 . . . .


 Q. . . . I'm asking you, the police showed up at Wal-Mart, didn't they?


 A. I didn't see no police.


 Q. Were you asked to leave the store, sir?


 A. No, sir.


 Q. You didn't get into an argument with Star Neville and jerk her purse
off of her arm and the police didn't show up?


 A. The police never showed up. 


 Texas Rule of Evidence 404(b) makes evidence of other crimes, wrongs, or acts admissible
for purposes other than proving the character of a person in order to show action in conformity
therewith, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, or
absence of mistake or accident. Whether the evidence is relevant for one of these purposes is a
function of the similarity of characteristics between the charged and extraneous offense regarding
the issue to which the extraneous act evidence is addressed. See Plante v. State, 692 S.W.2d 487
(Tex. Crim. App. 1985). To rebut a defense of accident to prove intent, the extraneous act must be
sufficiently similar to the charged offense that the inference of improbability of accident comes into
play. See Morgan v. State, 692 S.W.2d 877, 881 (Tex. Crim. App. 1985).

 The record does not indicate what purpose, if any, other than character conformity, the
extraneous-act evidence was intended to address. The State argues the evidence was relevant to
rebut the defensive theory that Duren had a nonviolent character and acted in conformity with that
character. While the list of permissible purposes in Rule 404(b) is not exhaustive and extraneous
acts may be relevant to rebut defensive theories not contained in the list, see Wheeler v. State, 67
S.W.3d 879, 887 (Tex. Crim. App. 2002) (defensive theories of impossibility and lack of
opportunity), Rule 404(b) specifically states that the act must be relevant apart from proving the
character of a person in order to show conformity therewith. While the testimony of the defense's
character witnesses supported Duren's theory that the injury was caused by an accident that occurred
when Duren voluntarily attempted to execute a wrestling move on Damon, their testimony that
Duren was nonviolent did not in and of itself constitute a defensive theory that the State could rebut
with extraneous acts under Rule 404(b). There is a lack of similarity between the act of arguing with
an adult and jerking her purse off her arm and inflicting fatal blunt force trauma on a child's head.
Similarity is lacking to such a degree that the inference that accident was improbable would not have
been supported. The extraneous act also lacked logical force regarding either intent or motive. 
Duren is correct that the extraneous-act evidence was not admissible under Rule 404(b). 

 When evidence of other crimes, wrongs, or acts is not relevant apart from showing character,
it may be admissible if it is evidence of a pertinent character trait and is offered by an accused in a
criminal case, or by the prosecution to rebut the same. Tex. R. Evid. 404(a)(1). If the
extraneous-act evidence is admissible under Rule 404(a)(1) to prove or rebut evidence that a person
acted in conformity with a particular character trait on a specific occasion, Rule 405 limits the
methods by which such character may be proved. Rule 405(a) provides that proof of character may
be presented in the form of reputation or opinion testimony. Rule 405(a) also provides that inquiry
into relevant specific instances of conduct is admissible on cross-examination of such reputation or
opinion witnesses. Rule 404(a)(1) only allows the prosecution to rebut the pertinent character trait
to which the defense witness's testimony referred. Allowing such cross-examination is a way to test
the witness's credibility and familiarity with the defendant or the defendant's reputation. See Brown
v. State, 477 S.W.2d 617, 620 (Tex. Crim. App. 1972). The examiner must have a good-faith belief
the event inquired of occurred, and the State is stuck with the witness's answer; the State may not
offer extrinsic evidence to prove the specific act occurred. See Maxwell v. State, 595 S.W.2d 126,
128 (Tex. Crim. App. [Panel Op.] 1980); Billingsley v. State, 473 S.W.2d 501 (Tex. Crim. App.
1971); Matthews v. State, 979 S.W.2d 720, 722 (Tex. App.-Eastland 1998, no pet.). 

 Duren argues that the extraneous act evidence exceeded the scope of permissible cross-examination. The State argues that the defense's witnesses created a false impression the State had
a right to correct. The defense's character witnesses testified Duren had a good reputation for being
peaceful and nonviolent toward children. However, they also testified that he had a reputation for
being nonviolent in general, that he does not cause any kind of trouble, and that he never tries to start
anything. Thus, the scope of character to which Duren's witnesses opened the door with regard to
correcting a false impression was as broad as his general character for nonviolence.

 However, a party may only correct a false impression left by a witness's testimony by cross-examining the witness who created the false impression and may not convert another party's fact or
expert witness into a character witness through its own cross-examination. See Wheeler, 67 S.W.3d
at 883-85. While the State did cross-examine some of the defense's character witnesses, the State
did not take the opportunity to inquire as to whether the witnesses knew of or had heard about the
argument Duren had at Wal-Mart. Although the State could have called its own reputation or
opinion witness on rebuttal to testify to the accused's character for violence, the State only inquired
about the argument in the Wal-Mart Store when cross-examining the defendant. Inquiries into the
extraneous act during Duren's cross-examination would not be admissible based on the false
impressions left by other witnesses, as the State argues. If the inquiry were permissible, Duren's
testimony must have created the false impression the extraneous act was intended to address. 
Further, the false impression must have been created during direct examination; the State cannot
create a false impression on cross-examination in order to open the door to extraneous-act evidence. 
Lopez v. State, 928 S.W.2d 528, 530-32 (Tex. Crim. App. 1996). 

 Duren's testimony on direct examination regarding his character for nonviolence or his
character for working with children included that he previously lived with Lisa Duren and her
children, interacted and played with her children and never had any problems with them, that he
interacted with Michelle's children and got along well with them, that he would watch Michelle's
children when she was gone, that he would play with Damon and watch television and wrestle with
him, and that he never intended to harm or knowingly harmed Damon. Duren's testimony, before
the extraneous act was introduced, did not include general assertions about himself or his character. 
Later in his testimony, Duren stated he had never struck a child out of anger or struck a child
knowing he would harm that child. Under this theory of admissibility, the State's cross-examination,
did exceed the scope of permissible cross-examination because, the defendant was not a reputation
or character witness, but a fact witness, and had not created a false impression that the admitted
evidence would have addressed. Therefore, the extraneous-act evidence was not properly admissible
under Rule 404(a). 

 Neither would the extraneous-act evidence have been proper as impeachment. Although
specific instances may be offered for purposes such as to rebut a sweeping assertion by the witness
of an unblemished past or to cure misleading statements regarding the witness's extent of trouble
with the law, Duren had made no such statements. See Bell v. State, 620 S.W.2d 116 (Tex. Crim.
App. [Panel Op.] 1980); Blevins v. State, 884 S.W.2d 219, 229 (Tex. App.-Beaumont 1994, no pet.). 
In fact, he candidly admitted that he could and did lose his temper sometimes and that he did slap
Michelle during an argument after she slapped him.

 The extraneous-act evidence was not properly admitted under either Rule 404(a) or 404(b).
We have not found any grounds on which the trial court's ruling would have been proper. Therefore,
the trial court erred in admitting the extraneous-act evidence. 

 Error in the admission of evidence is nonconstitutional error governed by Rule 44.2(b), which
directs that the error must be disregarded if it does not affect the appellant's substantial rights,
meaning the error had a substantial and injurious effect or influence in determining the jury's verdict. 
King v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). When the error is not constitutional,
the burden is on the appellant to show actual harm. Merritt v. State, 982 S.W.2d 634, 636 (Tex.
App.-Houston [1st Dist.] 1998, pet. ref'd, untimely filed). The appellate court must review the error
of admission in relation to the entire proceeding, considering everything in the record. The
reviewing court will not overturn a criminal conviction for nonconstitutional error if, after examining
the record as a whole, the court has fair assurance the error did not influence the jury, or had but a
slight effect. Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). 

 Duren argues that his mens rea was the only contested issue and there is no fair assurance
the extraneous-act evidence did not cause the jury to infer that Duren was a violent man who would
knowingly injure a child and, therefore, the admission of such evidence had a substantial and
injurious effect in determining the jury's verdict. While the State suggests that because the
extraneous-act evidence complained of comprised a mere fifteen lines of questioning, we do not find
this to be relevant or persuasive. 

 The record reveals that during the State's cross-examination of Duren, the State also
questioned Duren about an argument he had with Michelle where she slapped him and he slapped
her back, and about an incident where he called in a threat to the business where Michelle worked. 
Any inference arising from the admission of the Wal-Mart incident that Duren's character was not
nonviolent or law-abiding would have also arisen from the other extraneous acts admitted into
evidence without objection. Additionally, the unobjected-to extraneous acts more strongly supported
the inference that Duren had a propensity for violence. We find the error did not have a substantial
and injurious effect or influence in determining the jury's verdict and that if it had any effect on the
jury, the effect was only slight. This point of error is overruled. 

Cruel and Unusual Punishment

 Duren contends his mandatory life sentence constitutes cruel and unusual punishment in
violation of the Eighth Amendment to the United States Constitution because his sentence is grossly
disproportionate to his offense and to the sentences of others convicted of similar crimes.

 To preserve a complaint for appellate review, an appellant must have presented to the trial
court, at the earliest opportunity possible, a timely request, objection, or motion stating the specific
grounds for the ruling desired. Jackson v. State, 69 S.W.3d 657, 658-59 (Tex. App.-Texarkana
2002, no pet. h.). Even constitutional rights may be waived by the failure to make a timely assertion
of that right. Id. 

 Duren did not raise his Eighth Amendment issues during his trial or in his post-verdict
Motion for New Trial. At his Motion for New Trial, the only constitutional argument raised was the
vagueness of the mens rea requirements for reckless and knowing. Because he raises the Eighth
Amendment issues for the first time on appeal, they have not been preserved for appellate review. 
This point of error is overruled.

Ineffective Assistance of Counsel

 Duren contends he received ineffective assistance of counsel because his trial counsel: (1)
failed to offer any evidence or argument concerning alternative sources of old bruising on Damon's
body; (2) failed to offer any controverting expert testimony concerning the means and manner of the
injury; (3) asserted a prejudicial insanity defense when there was no evidence to support this defense;
(4) failed to object when the State cross-examined him about a prior extraneous event involving a
fight with his girlfriend; and (5) failed to object to the State's misstatement of the law during opening
statements. 

 To prevail on an ineffective assistance of counsel claim, an appellant must show first that
trial counsel's performance was deficient and fell below the standard of prevailing norms, and second
that the deficient performance prejudiced the defense and there is a reasonable probability that but
for counsel's unprofessional errors, the result of the proceeding would have been different. See
Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The burden
is on the appellant to identify the acts or omissions of counsel that constitute ineffective assistance
and affirmatively prove they fell below the professional norm for reasonableness. Id. The record
must affirmatively demonstrate the alleged ineffectiveness. See Dewberry v. State, 4 S.W.3d 735
(Tex. Crim. App. 1999). The court presumes that trial counsel's actions and decisions were
reasonably professional and motivated by sound trial strategy. See Jackson v. State, 877 S.W.2d 768,
771 (Tex. Crim. App. 1994). 

 Duren contends his trial counsel's decision not to introduce controverting testimony about
the source of old bruising could not be justified as the product of reasoned professional judgment
or trial strategy. Duren argues that his trial counsel recognized the inference the jury could make
from the introduction of the evidence of the old bruises. Duren points to his counsel's Motion in
Limine to exclude some photographs of the bruises, his argument responding to the State's Motion
in Limine to exclude any evidence of abuse by Damon's mother, his objection regarding the
admission of the autopsy report reflecting old bruising, and his indication to the court he was
prepared to introduce evidence to controvert that inference. Duren argues that his counsel's failure
to introduce evidence to controvert the inference when it became apparent that the old bruises were
an essential element of one of the State's expert witness's conclusion, constituted deficient
performance falling below the standard of prevailing norms. 

 However, Duren's trial counsel's failure to object to the doctor's testimony regarding the old
bruising and failure to present evidence of alternative sources of the bruising may have been
reasonable trial strategy. By not introducing evidence that the old bruises may have been inflicted
by Damon's mother, Duren protected his client from evidence that Duren had inflicted the old
bruises, which may have been admissible had he opened that door, and from drawing attention to
the inference that Duren wanted to avoid. 

 Duren contends he received ineffective assistance of counsel because his trial counsel failed
to offer any controverting expert testimony concerning the means and manner of the injury. Duren's
counsel demonstrated there was some degree of controversy in the medical community concerning
whether and to what extent the mens rea element can be ascertained solely from circumstantial
evidence concerning the nature and extent of the injury under the circumstances of Damon's injuries,
by asking the State's expert witnesses about contrary research or articles. Duren argues that his trial
counsel should have offered the reports or studies about which he asked the experts into evidence,
either directly or through expert witnesses.

 Duren's trial counsel did present evidence of an alternative manner and means by directly
presenting an alternative theory through Duren's testimony and in attempting, on cross-examination,
to elicit a concession from the State's expert witnesses that the injuries could have been caused by
a trivial fall, being tossed in the air, or resuscitative shaking. Duren's trial counsel also engaged the
services of Dr. Robert Goldberg to review the medical evidence and presumably develop an
alternative version of events, provided him with the medical evidence, and consulted with him
personally. Duren's trial counsel's failure to call Dr. Goldberg as a witness may have been due to
Dr. Goldberg's findings being similar to the State's experts' findings and, thus, not helpful to the
defense. There may also have been sound trial strategy for not offering into evidence the particular
articles mentioned. They may not have been admissible. See Tex. R. Evid. 803(18). The source
of the articles or the procedure used in the study may have been susceptible to credibility attacks. 
The injuries examined in the articles may have been distinguishable from Damon's injuries. 

 Duren contends he received ineffective assistance of counsel because his trial counsel
asserted a prejudicial insanity defense when there was no evidence to support this defense. Duren
recognizes that the testimony of Dr. Mary Weatherby, a local psychologist, amounted to the
conclusion that Duren was not aware of the reasonable certainty of death associated with his conduct,
but contends that raising an insanity defense when the evidence is not sufficient to establish an
insanity defense served only to distract the jury, at best, and make them angry, at worst.

 Duren's only viable defense was to attempt to show he did not have the requisite mental state
when he inflicted the fatal trauma on Damon. However, except when a defendant's sanity is at issue,
expert testimony regarding a defendant's state of mind at the time of the offense is inadmissible
during the guilt/innocence phase of trial. See Osby v. State, 939 S.W.2d 787, 790 (Tex. App.-Fort
Worth 1997, pet. ref'd). Because of the nature of the case, waiting to present the mitigating state of
mind evidence at punishment would be futile because if the jury found Duren guilty of murder, the
punishment was automatic, but if they found him guilty of a lesser-included offense, then there
would be no need for the mitigating evidence to show he had a lower mental state than required for
murder. By asserting an insanity defense, Duren's trial counsel was also able to introduce the
mitigating evidence and produce a psychological basis for the jury to find that Duren did not have
the requisite mens rea for capital murder. 

 Duren's trial counsel spent a considerable amount of time consulting with his client and with
Dr. Weatherby. The record reflects Duren's trial counsel also spent a considerable amount of time
researching the insanity issue. Counsel's assertion of the insanity defense reflects an effort to provide
the jury with otherwise inadmissible evidence to negate the mens rea element and prevent Duren's
conviction. 

 Duren contends he received ineffective assistance of counsel because his trial counsel failed
to object when the State cross-examined him about a prior extraneous event involving a fight with
his girlfriend. Although counsel does not have a duty to object to admissible evidence, under the
same reasoning discussed above, this extraneous-act evidence was inadmissible. Duren's trial
counsel demonstrated he knew extraneous-act evidence was objectionable when he objected just
moments later to the Wal-Mart incident. His failure to object to the slapping incident may be
explained as reasonable trial strategy to not draw the jury's attention to the testimony. Duren's trial
counsel may have already known about the slapping incident and determined the evidence that he
slapped his girlfriend after she had slapped him would not particularly harm him and would indicate
his girlfriend's tendency to resort to violence when she was angry, rebutting the possible inference
that Duren had inflicted Damon's old bruises. Duren's trial counsel may have objected to the other
extraneous offense because he did not know what had happened in that incident. 

 Even if his trial counsel's failure to object to the extraneous-offense testimony was not
reasonably professional or fell below the standard of prevailing norms, we do not find that there is
a reasonable probability that but for such errors, the result of the proceeding would have been
different. Based on the other evidence from which the jury could have inferred that Duren
knowingly inflicted Damon's injuries, absent the weak inferences that could have arisen from the
slapping incident, the result would likely have been the same. 

 Duren contends that his trial counsel's failure to object to the State's misstatement of the law,
during opening statements, regarding what the State must prove to find that Duren knowingly
inflicted Damon's injuries also constituted ineffective assistance of counsel. Duren contends that
during opening statements, the State said it need only prove Duren was aware that his conduct could
result in death, not that he must be aware his conduct was reasonably certain to result in death. 
Duren does not cite to the record, and we do not find that the State misstated the law during opening
arguments. In discussing the relevant mens rea requirement, the State told the jury that the State was
providing a shorthand version of "knowingly" and that the trial court would instruct them as to the
legal definition. Such comments were not objectionable; therefore, Duren's trial counsel did not err
in failing to object. 

 The alleged errors of trial counsel do not fall below the prevailing standard of competence
or did not harm Duren to the extent that there is a reasonable probability that without such errors the
result would have been different. This point is overruled. 

 The judgment of the trial court is affirmed. 



 Ben Z. Grant

 Justice


Date Submitted: July 16, 2002

Date Decided: August 14, 2002


Publish