

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-16-00218-CR
_____

CLIFFORD JAMES GAYTON, JR., Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 102nd District Court
Bowie County, Texas
Trial Court No. 16F0597-102

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Chief Justice Morriss

## MEMORANDUM OPINION

When she checked on her two young children, two-year-old David and one-year-old Mary,[1] several hours after returning home from work, Frances Lucas found David cold and not breathing. Lucas and her boyfriend, Clifford James Gayton, Jr., made several attempts to revive David and finally called 9-1-1. Both police and emergency personnel responding to the emergency dispatch also attempted to revive David, to no avail. While emergency personnel were attending to David, two of the police officers learned from Gayton that Lucas' one-year-old daughter, Mary, was in a bedroom. When they checked on Mary, they found her awake, but not responding normally. After removing a blanket, the officers saw that Mary had red bruises and discoloration on her chest and entire abdomen, similar to the bruises found on David. Consequently, Gayton, who had charge of the children while Lucas was at work, was convicted by a Bowie County jury of capital murder[2] and of injury to a child[3] and was assessed punishments of life imprisonment without parole and ten years' imprisonment, respectively. In this appeal,[4] Gayton challenges only the legal sufficiency of the evidence supporting his capital murder conviction. Because we find legally sufficient evidence supports the jury's verdict, we affirm the trial court's judgment.

---

[1]We will refer to the minor victims and their immediate family members by pseudonyms to protect the privacy of the surviving child, Mary. *See* TEX. R. APP. P. 9.10(a)(3).

[2]*See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011), § 19.03(a)(8) (West Supp. 2016).

[3]*See* TEX. PENAL CODE ANN. § 22.04(a)(3) (West Supp. 2016).

[4]In a separate appeal to this Court, Gayton challenges the sufficiency of the evidence supporting his conviction for injury to a child. That appeal is addressed in an opinion released the same date as this opinion in our cause number 06-16-00217-CR. Gayton has filed a consolidated brief in the two appeals.

In evaluating legal sufficiency of the evidence, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). We perform our review under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In drawing reasonable inferences, the jury "may use common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life." *Duren v. State*, 87 S.W.3d 719, 724 (Tex. App.—Texarkana 2002, pet. struck) (citing *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring)). Further, the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony and may "believe all of a witnesses' testimony, portions of it, or none of it." *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App. 2014). We give "almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility." *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).

In our review, we consider "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Hooper*, 214 S.W.3d at 13 (quoting *Cordova v. State*, 698 S.W.2d

3

107, 111 (Tex. Crim. App. 1985)). It is not required that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* "Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone." *Ross v. State*, 507 S.W.3d 881, 904 (Tex. App. —Texarkana 2016, pet. granted) (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015)); *Hooper*, 214 S.W.3d at 13 (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The "hypothetically correct" jury charge is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*. Under the indictment and the statute, the State was required to show beyond a reasonable doubt that on or about January 27, 2016, (1) Gayton (2) intentionally or knowingly (3) caused the death of David, (4) who was under ten years of age. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(1), 19.03(a)(8). Gayton challenges the sufficiency of the evidence, focusing primarily on whether he intentionally or knowingly caused David's death, although he also points out that no witness directly testified that he inflicted the injuries on David that resulted in his death.

"Capital murder is a result-of-conduct offense; the crime is defined in terms of one's objective to produce, or a substantial certainty of producing, a specified result, i.e. the death of the

4

named decedent." *Louis v. State*, 393 S.W.3d 246, 251 (Tex. Crim. App. 2012) (quoting *Roberts v. State*, 273 S.W.3d 322, 329 (Tex. Crim. App. 2008), *abrogated in part by Ex parte Norris*, 390 S.W.3d 338, 341 (Tex. Crim. App. 2012)). An intentional state of mind is established "when it is [the actor's] conscious objective or desire to . . . cause the result." TEX. PENAL CODE ANN. § 6.03(a) (West 2011). An actor has a knowing state of mind "when he [or she] is aware that his [or her] conduct is reasonably certain to cause the result." TEX. PENAL CODE ANN. § 6.03(b) (West 2011).

A "defendant's state of mind is a question of fact that must be determined by the jury." *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003) (citing *Smith v. State*, 965 S.W.3d 509, 518 (Tex. Crim. App. 1998)). It is determined from all of the circumstances. *Smith v. State*, 965 S.W.3d 509, 518 (Tex. Crim. App. 1998). The jury may infer the requisite mental state from the acts, words, and conduct of the defendant, and from the extent of the injuries to the victim, the method used to produce the injuries, and the relative size and strength of the parties. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); *Duren*, 87 S.W.3d at 724. Other facts in evidence may also support the jury's inference of knowing conduct or an intent to kill on the part of the defendant. *Brown*, 122 S.W.3d at 800; *Duren*, 87 S.W.3d at 724.

The evidence at trial showed that, on the date of the incident, January 27, 2016, David was two years old, and Mary was one year old. Gayton had begun staying with Lucas and her children one or two months earlier, and Lucas had established the practice of leaving the children with Gayton while she went to work. Lucas testified that she changed the children's diapers early that morning, then she left them with Gayton while she ran some errands with LaQuanda Heard,

5

Gayton's sister. At the time, the children were well and playing. Lucas returned home sometime later to get ready for work; she then left for work around 3:00 p.m. She testified that, when she left for work, the children were alive and well.

While she was at work, Lucas attempted to call Gayton several times to check on her children, but he would not answer. Around 6:00 p.m., Lucas was worried since she had not heard from Gayton and expressed her concern to her co-worker. Gayton finally called Lucas around 8:11 p.m., about the time she got off work. Gayton told Lucas that he had fed the children neck bones and corn and had put them in bed. He also told her he would call Heard to come pick her up.

When Heard picked Lucas up around 8:40 p.m., they picked up Heard's boyfriend, Ronnie Hollins, and went to the Smith-Keys apartments to purchase some synthetic marihuana. Although Lucas denied it, both Heard and Hollins testified that Lucas and Hollins smoked some of the synthetic marihuana on the way to Lucas' apartment. After Lucas returned to her apartment sometime between 9:00 p.m. and 10:00 p.m., she peeped into the children's bedroom door to check on them. She then took a shower and watched television until around midnight, when she again checked on the children. Lucas testified that, at that time, while Mary was breathing, David was cold and not breathing.

Lucas picked up David and woke up Gayton, telling him that David was not breathing. She testified that Gayton kept telling her that David was all right and was breathing. When Lucas attempted to perform CPR on David, she noticed that his jaw was locked shut. At some point, Gayton tried to revive David using warm water and kept telling Lucas that he was breathing and

6

not to call anyone. Lucas attempted to call, in turn, 9-1-1, Heard, and her mother, and she successfully connected with 9-1-1 around 12:23 a.m.

Craig Buster testified that he was one of the first officers to arrive at the apartment and that he arrived less than five minutes after receiving the dispatch. When he arrived, he found David lying on his back with his arms and legs spread. He could not detect a breath or a pulse and noticed that David was cool to the touch. He also testified that David, who was naked, had substantial bruising over much of his body and a fresh cut on his left upper lip. Buster said that, when the paramedics arrived shortly thereafter, they were unable to intubate David because his jaw was stiff.

Buster, as well as the other officers and emergency personnel that responded, described Lucas as very distraught, sobbing, inconsolable, and hysterical during the entire time they were on the scene. By contrast, they described Gayton as very even and noted that he showed no emotional response. While Buster was at the apartment, Gayton told Buster that he had been watching the children and that they went to bed around 8:30 p.m.

Buster also learned that there was a second child in the apartment. He and Jennifer Hargrave, another Texarkana police officer who responded to the call, followed Gayton into a bedroom where the child was lying in a collapsible bed. The child, Mary, was covered in a blanket, staring at them. When Hargrave leaned down to talk with her, she noted that Mary did not move her body or respond like a normal child, but simply lay there with her eyes open like a doll. When Hargrave removed the blanket covering Mary, the officers noted that she had red scratching or bruising and discoloration to her neck, chest, thighs, and entire abdomen, similar to those seen on David. When they asked Gayton what happened to her, he did not appear to be surprised and made

7

no statement regarding the injuries. Hargrave also testified that, sometime later, Gayton made an unsolicited comment about having had an ex-girlfriend that beat her child. Buster, too, testified that Gayton had made an unsolicited comment to him that he was against child abuse. In addition, another officer, Misty Tyler, testified that Gayton told her that morning that the children were not his, but that he treated them like they were his own because he was against child abuse.

Jason Hale, a paramedic with the Texarkana Fire Department, testified that, when he arrived, emergency personnel were performing CPR on David. He reached down to take David's pulse and noted that David's elbow was stiff, but still warm to the touch. He also testified that, when emergency personnel attempted to intubate David, his jaw was stiff and they were unable to force it open. Further, when they tried to start an intravenous line in David's leg, his knee and entire leg were stiff.

Mark Sillivan, a crime scene analyst with the Texarkana, Texas, Police Department (TTPD), testified that, during the investigation of the scene, he found a diaper with what appeared to be blood inside on the sink in the bathroom. Also, in the children's bedroom, he found a pillow case with a suspected spot of blood on David's bed, as well as a suspected blood smear on his mattress. He also collected a diaper and a plastic bag with a child's clothing containing feces in a garbage can outside of the apartment. All of this evidence was sent to the Texas Department of Public Safety Crime Laboratory in Garland, where the blood on the items was determined to be over eight quintillion times more likely to be David's than a random individual. Sillivan also testified that he found some packages of synthetic marihuana on top of the refrigerator in the

8

kitchen. Sillivan also took photographs of the injuries suffered by David and Mary, which photographs were published to the jury.

Tracy Dyer, the medical examiner who performed an autopsy on David, testified that David was thirty-four inches tall and weighed twenty-eight pounds. Using photographs taken at the autopsy, as well as those taken by Sillivan, she described the extensive injuries incurred by David. Dyer described multiple abrasions and contusions to the front, sides, and back of David's head, including three large contusions to the back of the head that caused very significant hemorrhaging of the brain. She opined that the contusions to the back of the head were caused by blunt force trauma of extraordinary force, either by his head being struck with an object or his head being slammed against a hard object. She testified that these were fatal injuries. She also testified that microscopic examination of the brain injuries revealed a diffuse axonal injury that occurs only when there is a very sudden acceleration/deceleration event with the brain. She opined that, since there was no report of an automobile accident, this was an indication of non-accidental trauma.

In addition to David's head injuries, Dyer testified that he suffered multiple contusions to the front and both sides of his face, which she opined were caused by blunt force trauma, probably a hand or fist. She also described multiple contusions and abrasions to his chest and abdomen, and testified that David's entire lower chest and upper abdomen were covered with contusions. Dyer also testified that contusions covered almost his entire back, indicating that David was beaten up and down both the front and back of his body. This same blunt force trauma caused internal injuries, including bruising to David's heart, lungs, pulmonary trunk, and thymus, and a laceration to his liver.

9

Dyer also described the bruising and abrasions to David's genitals, including two lacerations to the scrotal sac. She testified that in order to inflict this injury both a crushing and sliding force would have to be applied, which she suspected to be in the form of stomping. Further, Dyer testified that there were diffuse contusions on the front and back of David's thighs that completely covered his thighs. She explained that these injuries were not just to the skin, but that there was hemorrhaging to the deep tissue of his thighs.

In Dyer's opinion, the cause of death was blunt force trauma caused by intentionally hitting David with or against an unknown object. She also opined that the extensive blood loss due to the injuries to his head and thighs was a contributing factor to his death. Dyer also explained that with a diffuse axonal injury, the person would lose consciousness so that David could not have been acting normally after sustaining his head injuries.

Dyer also explained the process of rigor, which causes the muscles to stiffen sometime after death. She testified that, for there to be complete rigor in which both the jaw and the extremities were stiff, the minimum amount of time from death would be two to four hours, but that it was more likely to be six to eight hours. Dyer also testified that, if David had been fed corn at around 8:00 p.m. the night of his death, there would have been corn in his stomach or intestinal tract, which there was not.

On cross-examination, she testified that placing the time of death at two hours before rigor was "a stretch." However, while she thought six to eight hours was more likely, she could not give a definitive time of death. She also testified that the vast majority of the injuries that David suffered were inflicted in the same time frame, but that a few of the abrasions may have been

10

earlier.  In addition, she testified that ninety-eight percent of these injuries would have been inflicted by a violent, sustained beating very close to the time of his death.

Brandi Wilson, a registered nurse and certified Sexual Assault Nurse Examiner (SANE), performed an examination of Mary on January 28, 2016.  Wilson testified that her examination showed that Mary had red discoloration to her nose, abrasions to her lip, and linear abrasions to her neck.  In addition, she had a large, square, purple discoloration to her abdomen and trunk, and linear red and purple abrasions to the right of her abdomen.  Also, Mary's legs had large areas of purple and red discoloration with linear abrasions, her labia had swelling with purple and red discoloration, and her inner thighs had bruising and linear abrasions.  Wilson also testified that Mary had linear red markings and abrasions on her left shoulder, bruising and red abrasions on her buttocks, and circular, irregular bruising on her posterior arm.  She agreed that the injuries were pretty severe.  Although she acknowledged that the injuries could be caused by accident, she testified that, in her opinion, they were caused by blunt force trauma and that they were consistent with the child being struck.  She acknowledged that she could not tell whether the injuries were inflicted by a male or a female.

Lucas also testified that Gayton had always been fair to David, but that Mary was his favorite.  She said that Gayton got angrier with David when he decided he was going to potty-train him, although she thought he was not ready.  Gayton told her that David was a mama's boy and cried too much.  When David went to the bathroom in his pants, Gayton would get upset and force David to sit on the potty chair for longer than necessary.  She said that Gayton always denied whipping her children.

11

Hollins testified that he had gone to Lucas' apartment about 11:00 a.m. that morning and stayed with Gayton while Heard and Lucas went to file taxes. He said that Gayton woke David and put him on the potty chair in the living room because he wet his bed. Hollins testified that David was placed on the potty chair around 12:00 noon and was on it when he left at 2:00 p.m. That was the last time he saw David. He testified that when he saw David he was moving slow, and that may have been because he had just awakened. He also said that David had a knot on the side of this head and was acting sick. However, he denied seeing any bruises on David's legs or body. Hollins also testified that, when he saw Gayton keep the children, he did a good job and that he fed and nursed them. In addition, he testified that he had seen Gayton smoke synthetic marihuana on many occasions and that they had smoked it that day. On cross-examination, he testified that he had seen Lucas punch David in the chest several times and push him to the ground. He admitted, however, that he did not tell the police that he had seen Lucas hit David.

Derrick Gant testified that he had gone to Lucas' apartment that day and smoked synthetic marihuana with Gayton. At the time, David was on the potty chair crying, and Gayton told him that David wanted off of the potty chair. Gant testified that at the time David was not bruised, staggering, or incoherent, and that he did not act like anything else was wrong. After they smoked, Gant left the apartment, and a few hours later Gayton found him and asked to buy some synthetic marihuana. Gant testified that he smoked some more synthetic marihuana with him at that time. Later that day when it was getting dark, Gayton came to his apartment asking to buy some synthetic marihuana on credit. Gant refused, but rolled a blunt of synthetic marihuana for them to smoke. He said that Gayton was pacing and would not sit down. After he rolled the blunt, Gayton took

12

two or three draws on it and left. Gant said that, earlier in the day, Gayton had been acting normal, but that evening it was out of character for Gayton to be pacing and to take only two or three draws on the blunt. He said that normally they smoked the whole thing. He had never seen him that way. Gant also testified that he had known Lucas since she was little and that he had never seen her hit her children. On cross-examination, Gant testified that he saw a bruise on David's head. He also said that, when Gayton came over that evening, he told him that Lucas was on her way home from work.

Scott Sartor was the lead detective investigating the case. He testified that, during his investigation, he concluded that Lucas did not have access to David at the time of his death. Sartor clarified that David's body was discovered around 12:13 a.m. and that the medical examiner advised him that, since rigor had set in, the time of death would have been six to eight hours before that time. Based on this, he placed the time of death at between 4:00 p.m. and 6:00 p.m., while Lucas was at work.

Sartor testified that both Lucas and Gayton gave recorded statements. He testified that, in his statement,[5] Gayton said that Hollins had left the apartment about 2:00 p.m. and that Mike Nard had left before him. Gayton also stated that he had fed David neck bones and corn at 8:15 p.m. Gayton told him that David had busted his lip on the playground the week before. Gayton also sought to explain David's injuries as resulting from playing with other children on the playground. In his statement, Gayton gave several different stories regarding the injuries David received to his head, including David falling off of his bed and hitting the corner of a subwoofer. Gayton

---

[5]An edited version of Gayton's recorded statement was published to the jury.

variously explained the marks in Mary's groin area as diaper rash, denied seeing them, said he could not explain them, and finally said that she got them playing with David. Gayton also said that he told Lucas not to call 9-1-1 because he thought David had started breathing. Although he agreed that whatever happened to the children occurred while they were in his custody, he denied killing David. Sartor also testified regarding his investigation of other persons identified as possible suspects and how he eliminated them as suspects.

Sergeant Jeremy Courtney of the TTPD assisted in the arrest of Gayton. After he was advised that Gayton might be at Heard's apartment, he and other officers went to her apartment around midnight. After Heard answered her door, Heard initially denied the officers access to her apartment and denied that Gayton was there. As they continued to talk with her, Courtney said that she kept looking back over her shoulder. After about ten to fifteen minutes, she allowed them to search her apartment, again declaring that Gayton was not there. Their search eventually ended in the master bathroom, where they located Gayton hiding in a cabinet behind a clothes basket and placed him under arrest. Both Heard and Hollins, who was also present, began yelling that he must have broken into the apartment through a window.

After the State rested, Gayton called several witnesses in his defense. Heard testified that after she picked Lucas up from work, Lucas wanted to buy some synthetic marihuana. After they purchased it, Lucas and Hollins smoked it before Lucas entered her apartment. She testified that they arrived at Lucas' apartment about 8:50 p.m. Heard also testified that she had seen Lucas hit her kids three times in the month that she had known her. She also denied stalling the police for fifteen minutes while Hollins hid Gayton on the night of his arrest. Markel Young, Gayton's

14

cousin, testified that he had seen Gayton and Lucas smoke synthetic marihuana in front of the children and that he had heard Lucas yell at her children and slap them. Latasha Curley, Gayton's sister, testified that Gayton brought the children to her house one weekend and that David had a gash on his head that Gayton said Lucas told him resulted from a fall down the stairs. In rebuttal, the State put on testimony through a 9-1-1 operator, a Texarkana, Arkansas, police officer, and Charnetta Gayton, another sister of Gayton, that Charnetta had previously reported that Gayton had assaulted her, her three-year-old child, and her baby.

By the end of trial, the jury had heard testimony from the medical examiner regarding the extensive external and internal injuries to David's head, torso, and thighs. These injuries included severe brain damage, as well as damage to David's heart, lungs, and liver. The medical examiner testified that the vast majority of the injuries occurred shortly before David's death and that his injuries and resulting death were caused by a violent and sustained beating with or against an unknown object. The medical examiner also opined that the time of death was at a time during which David was in the care of Gayton. The jury also heard Gayton's changing explanations of how David incurred his injuries, which it could reasonably find implausible considering the extent of his injuries. The jury also heard Gayton's claim that he had fed David corn that evening, which was belied by the absence of any corn found in his stomach or intestinal tract during the autopsy. Further, before David's death, the testimony showed that Gayton had forced David to sit on his potty chair for at least two hours and that Gayton was upset that David would soil his bed. Also, several witnesses testified that a few hours before David's death, the only noticeable mark on David was a bruise or knot on his head, and that otherwise he seemed healthy. Testimony also

15

showed that Gayton smoked synthetic marihuana three times that day while the children were in his care. In addition, the jury heard testimony that, during the timeframe of David's death and thereafter, Gayton was not acting in his normal manner. Gayton would not answer Lucas' telephone calls, and, immediately before Lucas' return home from work, he was nervously pacing and smoking synthetic marihuana. The jury also heard testimony, as well as Gayton's statement, that after David's body was discovered, Gayton sought to convince Lucas that David was still breathing and that she should not call 9-1-1. It also heard testimony from Lucas, the responding officers, and a paramedic that Gayton showed no emotion while they sought to revive David and that he made unsolicited comments about his aversion to child abuse. The jury was also shown photographs of David, heard testimony that he was thirty-four inches tall and weighed twenty-eight pounds, and could note the disparity in his size to Gayton, who was at trial. Finally, although several other people were present at the apartment at some point that day, the testimony showed none of them were present during the likely timeframe of David's death. Significantly, in his statement Gayton admitted that whatever happened to David occurred while he was in his care. Although Gayton identified several other people who had been at the apartment, he never told the police that any of them harmed David.

When considering Gayton's words and actions before and after the death of David, his admission that the injuries occurred while David was in his care, and his implausible explanation of David's injuries, the jury could reasonably infer that Gayton caused the death of David. Also, considering the disparity in the size and strength of Gayton and David, the extent and nature of David's injuries, and the amount of force required to inflict such injuries, the jury could reasonably

16

infer that Gayton either intended to cause David's death or was aware his conduct was reasonably certain to cause David's death. *See Duren*, 87 S.W.3d at 726. Legally sufficient evidence supports the jury's verdict.

We affirm the judgment of the trial court.


                                             Josh R. Morriss III
                                             Chief Justice

Date Submitted:      July 18, 2017
Date Decided:        August 4, 2017

Do Not Publish