

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-10-00070-CR

_____

DANIEL REED YORK, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 336th Judicial District Court
Fannin County, Texas
Trial Court No. CR-09-23270

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

Daniel Reed York borrowed Debra Hutchings' 2004 Chevrolet Trailblazer sport utility vehicle (SUV), with the expressed intention to go out for a pack of cigarettes. More than thirty hours later, York, still driving the vehicle, was arrested and charged with unauthorized use of a vehicle.[1] In a jury trial in Fannin County, York was convicted and sentenced to two years' confinement. York now appeals, claiming the evidence is legally and factually insufficient. We affirm the trial court's judgment, because the evidence was legally and factually sufficient.

We review the legal and factual sufficiency of the evidence supporting a conviction under well established standards. In conducting a legal sufficiency review, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Sanders v. State*, 119 S.W.3d 818, 820 (Tex. Crim. App. 2003). We must give deference to "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). We are not required to determine whether we believe that the evidence at trial established guilt beyond a reasonable doubt; rather, when faced with conflicting evidence, we must presume that the trier of fact resolved any such conflict in favor of the prosecution, and we must defer to that resolution. *Turro v. State*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993).

---

[1] TEX. PENAL CODE ANN. § 31.07 (Vernon 2003).

In conducting a factual sufficiency review, we consider the evidence in a neutral light. *Watson v. State*, 204 S.W.3d 404, 414–15 (Tex. Crim. App. 2006). The verdict will be set aside only if (1) it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust, or (2) it is against the great weight and preponderance of the evidence. *Id.* at 415 (citing *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000)).

Both legal and factual sufficiency are measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *see also Grotti v. State*, 273 S.W.3d 273, 280 (Tex. Crim. App. 2008). The State was required to prove that York: (1) intentionally or knowingly operated a motor-propelled vehicle (2) without the effective consent of Hutchings, the vehicle's owner. TEX. PENAL CODE ANN. § 31.07. An actor may have permission to operate another's motor-propelled vehicle, but then exceed the scope of the owner's permission or consent. For example, where the actor had permission to drive another's vehicle and leave it in a specific parking lot for the owner to retrieve the vehicle, "driv[ing] around in the vehicle until [actor/appellant] was ready to return it" exceeds the scope of the owner's consent and constitutes unauthorized use of the vehicle. *Dodson v. State*, 800 S.W.2d 592, 593–94 (Tex. App.—Houston [14th Dist.] 1991, pet. ref'd).

Hutchings testified that she had known York for about two years, that Hutchings' and York's daughters were good friends, and that Hutchings was a friend of York's ex-wife, Trina Gee. Hutchings denied any romantic interest in York.

3

In August 2009, Hutchings occasionally let York use Hutchings' SUV. On two occasions, August 11 and 12, York drove Hutchings in her vehicle to her job in McKinney. On one of those days, Hutchings found she was not scheduled to work, and the two went to lunch; the next day, August 12, York took Hutchings to work, then used her SUV during the day to bid for construction jobs. He arrived about two hours late to pick her up.

That night, York slept on the couch at Hutchings' home in Bonham. In the early morning of August 13, York asked Hutchings to borrow her SUV to go buy cigarettes. Hutchings said she told him to go to one specific store, as it was the only one open at that time of night. She did not recall him asking to go to another city, such as Dallas or Sherman.

Hutchings also testified she slept very soundly due to medications she took.[2] "[P]eople -- they don't wake me up in the middle of the night once I go to sleep."

When Hutchings woke about 6:30 or 7:00 the morning of August 13, York had not returned with her SUV. She immediately called York; after several calls, he finally answered, and told Hutchings he was "ten minutes away." Over the next twenty-four hours, Hutchings placed scores of calls to York. In fact, State's Exhibit 1, York's cell phone records, document sixty-three calls from Hutchings to York, some of which he answered, some he did not. Hutchings said that, throughout August 13 and into the morning of August 14, York kept telling her he was within ten minutes of returning her SUV. Finally, the morning of August 14, Hutchings called Bonham

[2]Hutchings took Seroquel and Klonopin at night; the inference of her testimony was that these medications made her sleep very soundly.

4

police and reported the vehicle as stolen. Around this time, York told Hutchings, over the telephone, he was returning to Bonham from Sherman. Waiting on the main highway connecting the two cities, Bonham police stopped the SUV, driven by York with two passengers, and arrested York for unauthorized use of a vehicle.

The State offered further testimony that York had exceeded the scope of Hutchings' consent to drive her vehicle. When stopped by police late the morning of August 14, York told Sergeant Josh Walker that York had permission to drive the vehicle; he admitted he was supposed to have returned the vehicle about 2:00 a.m., August 14.

Devada Flowers had known York previously, and met with York about midnight or 1:00 a.m. August 14 in Dallas. The two "h[u]ng out" together throughout the early morning hours; York followed Flowers, who dropped off the vehicle she had been driving. Flowers then rode with York to Sherman. Flowers said she did not know to whom the vehicle belonged, but York received several telephone calls where the caller was asking the location of the caller's vehicle, to which York answered, "Debra, I'm on my way back." Closer to noon on August 14, Bonham police stopped the vehicle as it entered Bonham. York was arrested, and Flowers and a male passenger were released.

York's defense rested primarily on the possibility that, because of Hutchings' medications, Hutchings may have given York permission to drive the vehicle longer than just to the store to buy cigarettes in the early morning of August 13. When York's counsel cross-examined Hutchings,

5

counsel suggested it was possible that she had given York permission to drive her SUV to Dallas, or that he had called her and said he was too tired to drive back. Hutchings, while acknowledging this was possible, was also quite clear in saying she did not think it likely she would permit York to take the SUV to Dallas. Hutchings also said that, if York had asked her permission to take the vehicle to Dallas, she would not have consented and that she did not give York permission to go to Dallas, but only to the store. Hutchings testified she thought such permission was "highly doubtful." She parried such questions from York's counsel:

> I told you that if he come back [sic] and asked me later, if I had a conversation with him, I don't recall it. It could have happened, but I don't -- I don't recall it. I mean, if I remember waking up for him to go to the store, I believe I would wake up if he asked me if he could drive my car to Dallas.

As will be discussed infra, the jury was free to weigh Hutchings' credibility and consider York's proposed scenario and decide between the two views.

In his case-in-chief, York presented testimony from Trina Gee, York's ex-wife and a friend of Hutchings, and from Victoria York, daughter of Gee and York. Gee said that, the morning of August 13, Hutchings called Gee and told her York had taken the vehicle to Dallas, with Hutchings' permission, but Hutchings did not go because she did not feel like it. Hutchings flatly denied this.[3] Gee also said that she spoke with Hutchings throughout the day on August 13

---

[3]The following is an excerpt of the testimony:

Q. Okay. So, you don't remember telling her that. Do you remember telling her that he has the car, he's in Dallas, it's okay, I didn't feel like going with him?

A. Nope.

and that Hutchings was never upset or angry about the situation until York's cell phone was answered by a female. At that point, according to Gee, Hutchings became "furious." Only then, according to Gee, did Hutchings begin to demand the immediate return of the vehicle. Hutchings, for her part, said that a woman did answer York's phone one time; the testimony was not clear, but it appears that this call occurred August 14, the second day York had the SUV. Hutchings said the woman who answered York's phone would not tell Hutchings where she, York, or the vehicle were at that time, and she hung up on Hutchings. It was around this time that Hutchings called the police. Although she did not explicitly deny that it was because a woman had answered the phone, Hutchings did say she had been conflicted over the absence of the vehicle for more than a day because, every time she spoke with York, he assured Hutchings he was about to return the vehicle, and was no more than ten minutes from doing so. After more than twenty-four hours of these conversations, Hutchings decided York was not going to return her vehicle. That was when she decided to alert the police.

York's evidence presented the jury with the theory that Hutchings reported her vehicle as stolen only due to anger or jealousy. That evidence consisted of testimony from Gee and York's daughter Victoria that Hutchings became angry only when another woman answered York's

Q. Okay.
A. Sure did not.
Q. You didn't tell her that?
A. Huh-uh.

7

phone, and Victoria's testimony that Hutchings admitted having a "romantic interest" in York. As said earlier, though, Hutchings denied any such romantic involvement or interest in York.

York also introduced into evidence Hutchings' affidavit of nonprosecution, executed November 17, 2009. In that document, Hutchings said that she wanted to drop charges, that her vehicle had been returned, that York's daughter and ex-wife were "close friends of the family," and that Hutchings did not want to press charges. Hutchings testified she executed this affidavit at the request of York's daughter Victoria, but Victoria denied this.

Viewed in the light most favorable to the verdict, a rational fact-finder could have found that York intentionally or knowingly operated a motor-propelled vehicle, Hutchings' SUV. York offered no testimony to refute statements by Flowers and Bonham police that York was driving the SUV,[4] and none to refute Hutchings' descriptions of her phone conversations with York over the two days in which he promised to return her vehicle soon. There was substantial evidence that York's use of the vehicle was in excess of Hutchings' effective consent.

Hutchings testified she permitted him to take the SUV to the store to buy cigarettes. She said she called him repeatedly over the next day and night demanding the vehicle's return. Even when York was arrested, about noon August 14, he told police he was to have returned the SUV about 2:00 a.m. that morning. The evidence was legally sufficient to support the jury's verdict.

---

[4]Bonham Patrolman Joe Gentry testified the SUV was, in fact, a motor-propelled vehicle. Hutchings did say, "the car was my father's," but also stated she made the payments and paid the insurance; throughout her testimony, she referred to the vehicle as hers. Nowhere did York attempt to rebut or disprove Hutchings' ownership.

8

Likewise, viewed in a neutral light, the evidence supports the jury's verdict. The verdict is neither so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust, nor against the great weight and preponderance of the evidence. York presented theories that Hutchings may have granted permission to borrow the SUV beyond the scope of her trial testimony or that she was vexed by another woman answering York's phone. Neither of those possibilities was so powerfully presented as to render the verdict clearly wrong. The jury was in the best position to evaluate the witnesses' credibility and resolve any conflicts in their testimony. *See Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000); *Duren v. State*, 87 S.W.3d 719, 724 (Tex. App.—Texarkana 2002, no pet.). The evidence was factually sufficient.

We affirm the trial court's judgment and sentence.[5]


Josh R. Morriss, III
Chief Justice

Date Submitted:     August 9, 2010
Date Decided:       August 13, 2010

Do Not Publish

---

[5]York asks, in the prayer of his brief, that, should we find the evidence legally and factually sufficient, we nonetheless reverse his conviction and remand this case to the trial court for a new punishment hearing. York offers no argument, authority, or explanation for this request. This request is inadequately briefed. TEX. R. APP. P. 38.1(i).