In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-09-00240-CR

                                                ______________________________

 

 

                         QUINCY WELLINGTON JACKSON,
Appellant

 

                                                                V.

 

                                     THE STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                       On Appeal from the 188th
Judicial District Court

                                                             Gregg County, Texas

                                                          Trial Court
No. 37,054-A

 

                                                       
                                           

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                              Memorandum Opinion by Justice Carter








                                                     MEMORANDUM 
OPINION

 

            After
a guilty plea, Quincy Wellington Jackson was convicted of robbery and sentenced
to forty years’ imprisonment.[1]  Prior to his plea, a jury found that Jackson
was competent to stand trial.  Jackson’s
sole point of error on appeal argues that evidence to support the jury’s
verdict at the competency hearing was factually insufficient.  We affirm the trial court’s judgment.  

            “A
competency hearing is civil in nature, so we apply the civil test and weigh all
the evidence to determine if the jury finding was so against the great weight
and preponderance of the evidence as to be manifestly unjust.”  Parker
v. State, 667 S.W.2d 185, 187 (Tex. App.––Texarkana 1983, pet. ref’d)
(citing Ex parte Watson, 606 S.W.2d
902 (Tex. Crim. App. 1980)).  Because an
accused is “presumed competent to stand trial,” a defendant must prove by a
preponderance of the evidence that he or she does not have “sufficient present
ability to consult with” his or her attorney “with a reasonable degree of
rational understanding,” or that the defendant does not have a “rational as
well as factual understanding of the proceedings against the person.”  Tex.
Code Crim. Proc. Ann. art. 46B.003 (Vernon 2006); see also Meraz v. State, 785 S.W.2d 146, 154–55 (Tex. Crim. App.
1990); Parker, 667 S.W.2d at 187.  Because the jury is the sole judge of the
credibility of the witnesses at the competency hearing, and weight given to
their testimony, it may accept or reject all or any of a witness’
testimony.  Parker, 667 S.W.2d at 187; Wesbrook
v. State, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000).  

            The
evidence presented at trial was conflicting.  Psychiatrist Frank Stewart Murphy interviewed
Jackson for two hours.  He noticed that
Jackson had “speech latency,” he took a long time to answer questions, and did
not demonstrate an understanding of the criminal charges against him.  Although he “didn’t witness any interactions
between [Jackson] and his defense counsel,” it did not appear to Murphy that
Jackson was “usefully helping his attorneys defend him.”  Murphy found that Jackson was not competent
to stand trial.  He concluded Jackson
suffered “severe mental illness” in the form of “personality disorder,” but
revealed his belief that Jackson “may have been exaggerating some of his
symptoms.”   

            This
exaggeration was noted by another expert witness.  Psychologist Thomas Allen testified Jackson
could not understand the purpose of the examination and limits of
confidentiality during the initial interview. 
Allen described Jackson as a “reluctant historian” during the one hour
and fifteen minute examination, leading to the conclusion that “cooperation was
an issue,” a trait not typically seen in people exhibiting mental illness.  Whereas persons with mental illnesses would
respond in some fashion, Jackson could not “interact in even a minimal sense.”  Allen “couldn’t get him to subtract 3 from
100, . . . [or] count to 5.”[2]
 This prompted Allen to question jailer
Daryl McClinton, who “had a lot of contact” with Jackson and said, “No, he
doesn’t act that way.  I talk to him all
the time.  He interacts with other
inmates.  He plays basketball.”  After this conversation raising “inconsistency
of behavior in an exam against behavior outside of that exam,” Allen became
convinced that Jackson was feigning his symptoms.  He testified “[i]t appeared to me that he was
trying to convey an image of someone who suffered from schizophrenia.  So he was giving me his ideas of what he
thought that looked like.”  Allen found
Jackson competent to stand trial.  

            Jailers
and others interacting with Jackson did not see reason for Murphy’s
concerns.  McClinton clarified for the
jury that Jackson would follow his commands and could carry on conversations “about
God, about his past experience in prison,” and would read and discuss scripture
without evidence of any speech latency. 
From June 2008, Jackson would report to Scott Finley of the Texas
Department of Criminal Justice “parole division” every month.  Finley testified that Jackson was able to
understand interview questions and could respond adequately.  He did not witness any “speech latency” and
described Jackson’s responses as “rapid fire.” 
Finley visited with Jackson the day before trial and handed him forms,
one of which Jackson refused to sign “because my attorney told me not to.”  Jail supervisor, Deputy Clifford Powell,
witnessed an argument Jackson had with a jailer, described his words as “rapid
fire,” testified that he did not witness any speech impediment, and stated that
Jackson could follow his directions. 
Jailers December Gray and Reagan Revellette also testified Jackson would
comply with their commands and could carry on a normal conversation with them
and with others without delay. 

            Although
Jackson was capable of logical conversation, his wife, Sara Armstrong, testified
he would “continuously repeat[] himself” during jailhouse visits and acted as
if he did not fully comprehend their conversations.  The jury later heard several telephone
conversations Jackson had with her which confirmed the suspicion that Jackson’s
presentation to the examiners was greatly exaggerated.  On the telephone, Jackson showed a remarkable
ability to speak clearly at an accelerated pace.  He carried on fairly intelligent
conversations, did not repeat himself, asked typical questions of Armstrong,
gave her advice, and was able to express his emotions and situation
clearly.  He discussed his desire to
obtain medical and prison records and inquired as to whether his wife had
contacted his parole officer.  The telephone
conversations did not reveal characteristics that would support Murphy’s
evaluation.  The difference was so marked
that a reasonable juror could have concluded that his appearance before the
medical examiners was concocted to give the appearance of incompetency.  

            While
Murphy only spoke with Jackson, Allen also interviewed McClinton, whose
statements about Jackson’s demeanor and understanding were confirmed by other
jailers.  The jury could determine Allen’s
assessment, which considered Jackson’s behavior outside of a competency
interview, proved more accurate.  Finley’s
testimony regarding Jackson’s ability to follow counsel’s instructions in
refusing to sign certain documents indicated he could have “sufficient present
ability to consult with” his attorney “with a reasonable degree of rational
understanding.”  Tex. Code Crim. Proc. Ann. art. 46B.003.  The jury, as sole judges of credibility, could
have rationally formulated a conclusion that Jackson was malingering,
especially after reviewing Jackson’s telephone conversations with
Armstrong.  This type of behavior could
justify a finding that Jackson had a “rational as well as factual understanding
of the proceedings against the person.” 
Because Jackson was “presumed competent to stand trial” unless he proved
otherwise, we find the evidence factually sufficient to support the jury’s
determination.  Jackson’s sole point of
error is overruled.  

            We
affirm the trial court’s judgment. 

 

 

                                                                        Jack
Carter

                                                                        Justice

 

Date Submitted:          August
26, 2010

Date Decided:             September
2, 2010

 

Do Not Publish











[1]Originally appealed to the Twelfth Court of Appeals,
this case was transferred to this Court by the Texas Supreme Court pursuant to
its docket equalization efforts.  See Tex.
Gov’t Code Ann. § 73.001 (Vernon 2005). 
We are unaware of any conflict between precedent of the Twelfth Court of
Appeals and that of this Court on any relevant issue.  See
Tex. R. App. P. 41.3.

 





[2]Allen
clarified that Jackson’s “interactions with arresting” and “interviewing
officers, certainly didn’t speak to mental retardation; didn’t speak to
psychotic thought disorder, either.” 








n3" name="_ftnref3" title="">[3]  Gee also said that she spoke with Hutchings
throughout the day on August 13 and that Hutchings was never upset or angry
about the situation until York’s cell phone was answered by a female.  At that point, according to Gee, Hutchings
became “furious.”  Only then, according
to Gee, did Hutchings begin to demand the immediate return of the vehicle.  Hutchings, for her part, said that a woman
did answer York’s phone one time; the testimony was not clear, but it appears
that this call occurred August 14, the second day York had the SUV.  Hutchings said the woman who answered York’s
phone would not tell Hutchings where she, York, or the vehicle were at that
time, and she hung up on Hutchings.  It
was around this time that Hutchings called the police.  Although she did not explicitly deny that it
was because a woman had answered the phone, Hutchings did say she had been
conflicted over the absence of the vehicle for more than a day because, every
time she spoke with York, he assured Hutchings he was about to return the
vehicle, and was no more than ten minutes from doing so.  After more than twenty-four hours of these
conversations, Hutchings decided York was not going to return her vehicle.  That was when she decided to alert the
police.

            York’s
evidence presented the jury with the theory that Hutchings reported her vehicle
as stolen only due to anger or jealousy. 
That evidence consisted of testimony from Gee and York’s daughter
Victoria that Hutchings became angry only when another woman answered York’s
phone, and Victoria’s testimony that Hutchings admitted having a “romantic
interest” in York.  As said earlier,
though, Hutchings denied any such romantic involvement or interest in
York.  

            York
also introduced into evidence Hutchings’ affidavit of nonprosecution, executed
November 17, 2009.  In that document,
Hutchings said that she wanted to drop charges, that her vehicle had been
returned, that York’s daughter and ex-wife were “close friends of the family,”
and that Hutchings did not want to press charges.  Hutchings testified she executed this
affidavit at the request of York’s daughter Victoria, but Victoria denied
this.   

            Viewed
in the light most favorable to the verdict, a rational fact-finder could have
found that York intentionally or knowingly operated a motor-propelled vehicle, Hutchings’
SUV.  York offered no testimony to refute
statements by Flowers and Bonham police that York was driving the SUV,[4]
and none to refute Hutchings’ descriptions of her phone conversations with York
over the two days in which he promised to return her vehicle soon.  There was substantial evidence that York’s
use of the vehicle was in excess of Hutchings’ effective consent.

            Hutchings
testified she permitted him to take the SUV to the store to buy
cigarettes.  She said she called him
repeatedly over the next day and night demanding the vehicle’s return.  Even when York was arrested, about noon
August 14, he told police he was to have returned the SUV about 2:00 a.m. that
morning.  The evidence was legally
sufficient to support the jury’s verdict.

            Likewise,
viewed in a neutral light, the evidence supports the jury’s verdict.  The verdict is neither so contrary to the
overwhelming weight of the evidence as to be clearly wrong and manifestly
unjust, nor against the great weight and preponderance of the evidence.  York presented theories that Hutchings may
have granted permission to borrow the SUV beyond the scope of her trial
testimony or that she was vexed by another woman answering York’s phone.  Neither of those possibilities was so
powerfully presented as to render the verdict clearly wrong.  The jury was in the best position to evaluate
the witnesses’ credibility and resolve any conflicts in their testimony.  See
Wesbrook v. State, 29 S.W.3d 103, 111
(Tex. Crim. App. 2000); Duren v. State,
87 S.W.3d 719, 724 (Tex. App.—Texarkana 2002, no pet.).  The evidence was factually sufficient.

            We
affirm the trial court’s judgment and sentence.[5]

 

 

 

                                                                        Josh
R. Morriss, III

                                                                        Chief
Justice

 

Date Submitted:          August
9, 2010           

Date Decided:             August
13, 2010

 

Do Not Publish

 

 

 











[1]Tex. Penal Code Ann. § 31.07 (Vernon
2003).





[2]Hutchings
took Seroquel and Klonopin at night; the inference of her testimony was that
these medications made her sleep very soundly. 






[3]The following is an excerpt of the testimony:

Q.             Okay.  So, you don’t remember telling her that.  Do you remember telling her that he has the
car, he’s in Dallas, it’s okay, I didn’t feel like going with him?

 A.           Nope.

 Q.           Okay.

 A.           Sure
did not.

 Q.           You
didn’t tell her that?

 A.           Huh-uh.






[4]Bonham
Patrolman Joe Gentry testified the SUV was, in fact, a motor-propelled
vehicle.  Hutchings did say, “the car was
my father’s,” but also stated she made the payments and paid the insurance;
throughout her testimony, she referred to the vehicle as hers.  Nowhere did York attempt to rebut or disprove
Hutchings’ ownership.





[5]York
asks, in the prayer of his brief, that, should we find the evidence legally and
factually sufficient, we nonetheless reverse his conviction and remand this
case to the trial court for a new punishment hearing.  York offers no argument, authority, or
explanation for this request.  This request
is inadequately briefed.  Tex. R. App. P. 38.1(i).