



## MEMORANDUM OPINION

No. 04-11-00875-CR

Eric **CERVERA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 226th Judicial District Court, Bexar County, Texas
Trial Court No. 2010CR11019
Honorable Sid L. Harle, Judge Presiding

Opinion by:  Marialyn Barnard, Justice

Sitting:  Catherine Stone, Chief Justice
Karen Angelini, Justice
Marialyn Barnard, Justice

Delivered and Filed:  October 10, 2012

AFFIRMED

After a jury trial, appellant Eric Cervera was found guilty of the capital murder of Jerrmiah Estabrook, a child under the age of six.  The trial court assessed punishment at life without parole.  On appeal, Cervera argues: (1) the evidence is legally insufficient, and (2) the trial court erred in denying his motion for new trial based on jury misconduct.  We affirm the trial court's judgment.

**BACKGROUND**

San Antonio Police Officer Julio Orta testified that on July 30, 2010, at approximately 4:00 p.m., he was dispatched to the residence of Ilandia Estabrook for a nonresponsive child. Jerrmiah was already in the ambulance when he arrived, so he spoke with Cervera, whom he identified as the "stepdad" and the only adult taking care of Jerrmiah. Cervera and his eight and ten-year old boys, E.J. and Fabian, moved in with Ilandia approximately two months BEFORE the day in question. Officer Orta described Cervera as distressed, worried, and nervous. Officer Orta also testified Cervera told him he put Jerrmiah down for a nap and when Cervera went to wake him up, he noticed Jerrmiah was nonresponsive, not breathing. Cervera called EMS. Officer Orta testified Ilandia was crying and hysterical. Officer Orta testified there were two other children at the apartment, but he did not speak to them.

The State next called San Antonio Fire Department paramedic Cruz Solis. Solis responded to the apartment complex for a "full arrest." When he made his initial evaluation, Jerrmiah had no pulse and was not breathing. Solis also noted Jerrmiah was "cool to the touch" and exhibited "no sign of life." Solis further described Jerrmiah's eyes as fixed and explained the dilated pupils indicated his brain was no longer controlling the iris part of the eye. During treatment, Solis did not uncover any signs Jerrmiah choked or had anything lodged in his mouth. Although the paramedics attempted several times to revive Jerrmiah, they never saw any type of response from the child. Solis also testified he noticed unusual bruising on Jerrmiah's forehead.

Investigator Crystal Martinez with the Bexar County Crime Lab identified a number of photographs taken at the scene. She also documented a small child's damp black t-shirt, a trashcan with a dirty diaper, and a pair of toddler jean shorts that were also soiled and damp – all

found in the bathroom attached to the bedroom where Jerrmiah was sleeping. Investigator Martinez also identified a towel, with blood stains, which had been found in the bedroom closet.

The jury next heard from Investigator Frank Randolph with Child Protective Services. Because there were other children in the apartment, Investigator Randolph was charged with interviewing everyone within the household to determine whether a safety plan was necessary for the other children. Investigator Randolph described Cervera as calm and remembered him crying a little bit.

According to Cervera's version of events as related to Investigator Randolph, Jerrmiah woke up at about 8:00 a.m. that morning. He had his diaper changed and Cervera gave him toys to play with in his bed. About an hour later, Ilandia left to purchase groceries. At 10:00 a.m., Ilandia came home, seated Jerrmiah at the table, and gave him some cereal. By 10:30 a.m., Ilandia left for work, Jerrmiah was finished with his breakfast, and E.J. was waking up. Cervera told Investigator Rudolph he took Jerrmiah to the bedroom where they listened to music and Cervera worked on the computer until approximately 1:30 p.m. Cervera claimed that at 2:30 p.m., "the alarm went off on my phone for [Jerrmiah's] nap." Cervera put Jerrmiah in his bed, gave him a cup with some Koolaid and laid him down. Cervera claimed that when he went back at 3:30 p.m., he called out several times to Jerrmiah, but he did not respond. Cervera further claimed that when he picked up Jerrmiah, Jerrmiah was "limp and cold" and would not wake up.

With regard to Jerrmiah's injuries, the State called Dr. Randy Frost, the Bexar County medical examiner. Dr. Frost identified at least six injuries about Jerrmiah's face and head, including several contusions or bruises over his left eye. Dr. Frost stated these injuries were consistent with a fist hitting his forehead, on the right side of his head, and on his right cheek. Dr. Frost testified to bruises up and down Jerrmiah's leg and on his left foot, at the base of the

toes. Additionally, there was bruising on Jerrmiah's penis, indicating a direct blow to his penis/pubic area. On Jerrmiah's back, Dr. Frost noted two areas of bruising, one a bit older than the other. Upon his internal examination, Dr. Frost noted Jerrmiah suffered severe abdominal bleeding, amounting to a loss of a third of his total blood volume. With regard to Jerrmiah's liver, Dr. Frost noted two areas of concern: (1) a large tear in the liver with no evidence of healing, and (2) two additional areas that appeared to have been injured earlier and were partially healed. Dr. Frost also noted bruising over the duodenum and a complete tear of Jerrmiah's pancreas. Dr. Frost testified Jerrmiah had several rib fractures, unusual in a small child, that were indicative of "a tremendous degree of force." Dr. Frost stated these injuries were consistent with a major blow, like a motor vehicle accident or direct blow, but not likely to be caused by children "horse playing." Finally, Dr. Frost explained that determining an exact time of the injuries causing Jerrmiah's death was difficult, especially considering both new and old injuries. He did conclude, however, that in his opinion, the newer injuries probably occurred within a matter of hours of Jerrmiah's death. Frost further testified that in his opinion the injuries came from multiple blows and were consistent with several blows by an adult hand and/or foot.

Ilandia tearfully testified about the events leading up to July 30, 2010. She told the jury she was in love with Cervera and, because he had recently lost his job, they agreed that he, E.J., and Fabian would move into her apartment. In exchange, because Ilandia was working two jobs, Cervera agreed to watch Jerrmiah to save on childcare expenses.

Ilandia testified she received a text from Cervera, about a week before the incident in question, in which Cervera explained that he and the boys were wrestling and Jerrmiah "had gotten a bruise." He told her not to worry, but explained that Jerrmiah was feeling a little sick and resting. When Ilandia arrived home, she saw a bruise on Jerrmiah's back and a bruise on his

face. Ilandia stated she was angry with Cervera, but he was adamant it was an accident. Ilandia testified that, the next day, Jerrmiah was lethargic, throwing up, and crying. Although she wanted to take Jerrmiah to the doctor, Cervera insisted E.J. had experienced a similar sickness and that Jerrmiah would be fine. He also warned her, that because of the bruise, if she went to the hospital that CPS would get involved. Cervera kept apologizing and Ilandia did not take Jerrmiah to the doctor. Ilandia testified that by Sunday Jerrmiah was feeling better and able to keep crackers and some liquids down; he grew gradually better throughout the week. Dr. Frost indicated the bruises and lethargic behavior were consistent with Jerrmiah's partially healed liver injuries. Specifically, Dr. Frost explained there would have been bleeding into the abdomen and Jerrmiah would have felt weak and dizzy, with a fast pulse.

With regard to July 30th, Ilandia testified Jerrmiah woke with a wet diaper. She changed the diaper, pulled the wet sheets off his bed, and threw the sheets in the closet. After dressing Jerrmiah, Ilandia went to the grocery store, and before she left for work, Jerrmiah was sitting at the table eating cereal. Ilandia was adamant that Jerrmiah did not have any bruises, especially not on his forehead or penis. During the day, Ilandia testified she ignored several text messages, but finally called Cervera only to be told that Jerrmiah was not breathing. Cervera told her the same version of events; however, Ilandia remembers Cervera telling her he performed CPR on Jerrmiah. The next day Cervera told Ilandia "they were going to arrest him" and "he was going away for a long time."

### LEGAL SUFFICIENCY

In his first issue on appeal, Cervera argues the evidence is legally insufficient to support a conviction, specifically because: (1) no motive was shown; (2) no weapon was found; (3) none of Cervera's blood or DNA was found on Jerrmiah or in locations that would suggest he cleaned

up; (4) Cervera called 911; (5) no one heard Jerrmiah screaming, suggesting someone else murdered Jerrmiah at another unknown location; and (6) the State's failure to call Cervera's eight year-old and ten year-old sons implies these witnesses would have been hostile to the State's theory of the case.

### *Standard of Review*

In reviewing the legal sufficiency of the evidence in a criminal case, an appellate court uses the standard established in the Supreme Court's opinion in *Jackson v. Virginia. Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)); *Mayberry v. State*, 351 S.W.3d 507, 509 (Tex. App.—San Antonio 2011, pet. ref'd). In reviewing a legal sufficiency claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Mayberry*, 351 S.W.3d at 509 (citing *Jackson*, 443 U.S. at 319). We must therefore defer to the jury's weighing of the evidence, resolution of conflicts in the testimony, and assessment of credibility. *Brooks*, 323 S.W.3d at 899; *see also Jackson*, 443 U.S. at 319 (taking into account the trier of fact's duty "to resolve conflicts in the testimony to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.").

This standard requires an appellate court resolve any inconsistencies in the testimony in favor of the verdict. *Gonzales v. State*, 330 S.W.3d 691, 694 (Tex. App.—San Antonio 2010, no pet.) (citing *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000)). Thus, in analyzing the legal sufficiency of the evidence, this court must determine whether the necessary inferences are reasonable based on the combined force of the evidence, direct and circumstantial, when viewed in the light most favorable to the verdict. *Mayberry*, 351 S.W.3d at 509 (citing *Clayton v. State*,

235 S.W.3d 772, 779 (Tex. Crim. App. 2007)); *see also Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) (holding standard of review is same for both direct and circumstantial cases).

Moreover, an appellate court must remain mindful not to reweigh the evidence or substitute its judgment for that of the jury. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony, and the jury may accept or reject all or any part of a witness's testimony. *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). The jury maintains the power to draw reasonable inferences from basic facts to ultimate facts; and their sole province to reconcile any evidentiary conflicts. *Welch v. State*, 993 S.W.2d 690, 693 (Tex. App.—San Antonio 1999, no pet.); *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995).

The State may prove its case by direct or circumstantial evidence so long as it meets its burden of proving each of the required elements of the charged offense beyond a reasonable doubt. *Easley v. State*, 986 S.W.2d 264, 271 (Tex. App.—San Antonio 1998, no pet.) (citing *Jackson*, 443 U.S. at 319). This is applicable to proving the accused was the perpetrator of the criminal offense. *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009); *Smith v. State*, 56 S.W.3d 739, 744 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd).

### *Analysis*

Cervera argues the State failed to prove he killed Jerrmiah Estabrook. More specifically, Cervera argues the State failed to establish, beyond a reasonable doubt, that, if Jerrmiah was hurt by someone, that Cervera and not one of the other children in the house, hurt him. Cervera asserts the State failed to present any direct evidence that he committed the murder or a witness claiming to have seen Jerrmiah injured or heard him cry. He also points out no murder weapon

was found, and not even the medical examiner could identify the exact weapon or type of weapon used to cause Jerrmiah's deadly injuries. Cervera concludes the circumstantial evidence is legally insufficient. We disagree.

By his own admission, Cervera was the only adult home at the time of the incident. The coroner testified: (1) it would take a great deal of force to cause the abdominal injuries, and (2) Cervera's version of the events simply did not make any medical sense. *See Duren v. State*, 87 S.W.3d 719, 726-27 (Tex. App.—Texarkana 2002, no pet.) (finding evidence sufficient including medical expert's testimony that child's injuries were not consistent with defendant's explanation). We hold this evidence, along with that detailed in the background section of this opinion, though circumstantial, was sufficient to allow the jury to find Cervera was the perpetrator of the offense. Accordingly, we overrule Cervera's challenge to the sufficiency of the evidence.

## MOTION FOR NEW TRIAL ON JURY MISCONDUCT

Cervera next argues the trial court erred in denying Cervera's motion for new trial, which was based on manifest "jury misconduct" during the guilt-innocence deliberations. More specifically, Cervera argues the jury notes asking if the jury assessed murder, whether Cervera was eligible for parole and who would decide how long his sentence would be show that the jury considered improper evidence during guilt-innocence deliberations. *See Staggs v. State*, 503 S.W.2d 587, 588 (Tex. Crim. App. 1974) (holding it is improper to inform jury regarding range of punishment during guilt/innocence phase of trial).

### *Standard of Review*

The grant or denial of a motion for new trial is within the discretion of the trial court. *Salazar v. State*, 38 S.W.3d 141, 148 (Tex. Crim. App. 2001). A new trial must be granted when

the jury has engaged in misconduct such that the defendant did not receive a fair and impartial trial. TEX. R. APP. P. 21.3(g). We reverse a trial court's decision to deny a motion for new trial only if the decision was so clearly wrong as to lie outside the zone within which reasonable persons might disagree. *Gonzales v. State*, 304 S.W.3d 838, 842 (Tex. Crim. App. 2010); *Smith v. State*, 286 S.W.3d 333, 339 (Tex. Crim. App. 2009).

### *Analysis*

A juror is not allowed to impeach her own verdict. *Glover v. State*, 110 S.W.3d 549, 551 (Tex. App.—Waco 2003, pet. ref'd). Texas Rule of Evidence 606(b) limits the evidence that may be presented to demonstrate jury misconduct. *Ford v. State*, 129 S.W.3d 541, 550 (Tex. App.—Dallas 2003, pet. ref'd); *Hines v. State*, 3 S.W.3d 618, 622 (Tex. App.—Texarkana 1999, pet. ref'd). Texas Rule of Evidence 606(b) provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit or any statement concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes. However, a jury may testify: (1) whether any outside influence was improperly brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve.

TEX. R. EVID. 606(b). Texas Rule of Evidence 606(b) "defines what evidence is admissible in establishing jury misconduct, while [Texas Rule of Appellate Procedure] 21.3 limits that permissible evidence to that which is relevant to the indictment or verdict." *Hines*, 3 S.W.3d at 622.

The only exception to Rule 606(b) permits jurors in criminal cases to testify regarding outside influences or to rebut a claim of disqualification. *Ford*, 129 S.W.3d at 550; *In re S.P.*, 9 S.W.3d 304, 308 (Tex. App.—San Antonio 1999, no pet.). An outside influence "is something

outside of both the jury room and the juror." *White v. State*, 225 S.W.3d 571, 574 (Tex. Crim. App. 2007); *In re S.P.*, 9 S.W.3d at 309 ("An outside influence must emanate from outside the jury and its deliberations, such as a non-juror introducing information to the jury."). A juror's injection of his own personal experiences, knowledge, or expertise is not considered an outside influence because those representations emanate from inside the jury. *Hines*, 3 S.W.3d at 623. A motion for new trial based on jury misconduct must be supported by a juror's affidavit alleging that an outside influence affected the jury's decision. *Id.*; *see* TEX. R. EVID. 606(b).

In support of his motion for new trial, Cervera presented an affidavit from a single juror. The relevant portion of the juror's affidavit states:

> During deliberations some of the jurors were considering whether to find the Defendant guilty of the lesser included offense of murder. There was concern among the jurors as to whether the Defendant would be paroled or receive an early release if convicted of murder instead of capital murder. Therefore, the presiding juror sent two notes to the court; one to determine who would set the Defendant's sentence if he was found guilty of murder and the other to determine if parole was possible for a murder conviction and what the minimum sentence would be. [referenced the two notes attached]

> After the Court was unable to answer the notes and referred us to the Court's charge the jurors considering a murder conviction voted to convict the Defendant of capital murder because they were concerned that otherwise the defendant might be paroled or released from prison early. It was taken into consideration the length of sentence yet not solely, along with other reasons.

Cervera's attorney proffered, and his bill of review supported, that this juror's in-court testimony would have been very similar to her affidavit testimony.

Neither the affidavit, nor any in-court testimony, established the requisite outside influence to support a claim of juror misconduct, and therefore Cervera's complaint does not fall within the exception to Rule 606(b). *See In re S.P.*, 9 S.W.3d at 308; *Hines*, 3 S.W.3d at 623. The statements in question were statements made by jurors to fellow jurors during deliberations. All of the events and processes described in the affidavit emanated from inside the jury. *See*

*Hines*, 3 S.W.3d at 623 (holding jurors' discussion of parole law during deliberations did not amount to outside influence). We therefore conclude the trial court did not abuse its discretion in denying Cervera's motion for new trial. *See Ford*, 129 S.W.3d 550-51 (holding trial court did not abuse its discretion in denying motion for new trial when supporting evidence was inadmissible under Rule 606(b)). Accordingly, we overrule this issue.

CONCLUSION

For the reasons stated above, the trial court's judgment is affirmed.

Marialyn Barnard, Justice

DO NOT PUBLISH