

## NUMBER 13-16-00013-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

---

**JESUS GONZALEZ,**                                                                 **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                            **Appellee.**

---

### On appeal from the 404th District Court
### of Cameron County, Texas.

---

# MEMORANDUM OPINION
### Before Justices Rodriguez, Contreras, and Benavides
### Memorandum Opinion by Justice Benavides

By three issues, appellant Jesus Gonzalez challenges his conviction and sentence

on three counts of injury to a child, first-degree felonies.[1]   *See* TEX. PENAL CODE ANN.

---

[1] The trial court sentenced Gonzalez and signed the judgment on October 23, 2015.  Gonzalez filed his notice of appeal in January 2016, after a hearing on his motion for new trial.  After numerous motions for extension of time to file appellant's brief and appellant's failure to file a brief, the Court abated this appeal and remanded to the trial court for further proceedings pursuant to Rule 38.8(b)(2), (3) of the Texas Rules of Appellate Procedure.  The case was reinstated in March 2017 after appointment of new appellate counsel to represent Gonzalez.

§ 22.04 (West, Westlaw 2017 through 1st C.S.). Gonzalez asserts that the trial court erred by admitting evidence of prior bad acts, that the evidence to support his guilt is insufficient, and that Gonzalez's sentences are excessive and failed to consider factors in mitigation of his culpability in violation of the Eighth Amendment. We affirm.

## I. BACKGROUND

Gonzalez was convicted of injuring eleven-month-old ANB.[2] ANB's mother Barbara testified at trial that she was a twenty-one-year old married woman with three children when she met Gonzalez on an internet web-site. She left her husband of six years in February of 2012 and moved to Texas to be with Gonzalez, who paid for bus tickets for Barbara and the children. For a while, Barbara and her children lived with Gonzalez in a motel. After a few weeks, they moved in with Gonzalez's parents where they stayed for five weeks. Barbara then qualified for an apartment and received aid from the State beginning in late April 2012. Gonzalez was not listed on her lease, although neighbors testified that they saw him at the apartment daily. During summer break, Gonzalez's two daughters lived with him and at the apartment regularly.

Dr. Margaret Western, ANB's pediatrician, testified at trial. At the time of ANB's birth in New Mexico in July 2011, he was a healthy baby with high newborn APGAR scores.[3] His height was at the 50th percentile during his checkups in New Mexico and his November 2011 checkup showed his weight was 13 pounds, 12 ounces, also in the

---

[2] We refer to the child by his initials and his mother by only her first name to protect the child's identity. *See* TEX. R. APP. P. 9.8.
[3] The APGAR score measures a newborn's color, heart-rate, reflexes, muscle tone and respiratory effort. American Academy of Pediatrics, Committee on Fetus and Newborn, http://pediatrics.aappublications.org/content/136/4/819 (last visited October 9, 2018).

50th percentile. ANB weighed 15 pounds, 6.4 ounces on January 23, 2012, and was in the 10th to 25th percentile in weight and the 25th percentile in height. He had no musculoskeletal symptoms but had episodic wheezing and a rash with eczema on both cheeks.

Barbara took ANB for medical care on June 3, 2012. She explained that ANB's older sister dropped him at a party the day before. ANB had bruising and swelling of his left eye, left temple, right temple area, and he had a scab on the right side of his neck. ANB had no brain bleed at that time, according to Dr. William Whe-Lyan Taw, a radiologist who reviewed ANB's CT films of June 3, 2012. ANB weighed 17 pounds and 1.7 ounces on July 3, which was approximately 3rd percentile.

On July 2, 2012, Barbara took ANB to the emergency room for right shoulder pain. He had an abrasion on the back of his head, his right shoulder blade was deformed, he was tender over his right collar bone, and he had limited range of motion in the right shoulder, according to Cynthia Kirkland, a nurse practitioner who treated ANB at Valley Baptist Medical Center's emergency department. The x-rays showed that ANB had a healing fracture of his right clavicle, or shoulder-blade. A different nurse practitioner, Leonorilda Hines, reviewed the x-rays with Barbara and Gonzalez on July 4, 2012. Barbara and Gonzalez denied any injury causing event other than that ANB had been dropped by his older sister. On July 4, ANB was alert, active and responsive, but Hines observed that ANB did not lift his right arm above his shoulder.

On July 8, 2012, Gonzalez called EMS at approximately 11 p.m. because ANB was having breathing problems. Julio Rodriguez, the responding paramedic, testified

3

that Barbara told him that ANB had been lying on the bed and then became very stiff, but when she picked him up he became flaccid. Rodriguez suspected ANB may have had a seizure. He recommended that ANB be taken to the hospital for further evaluation. Barbara told him that she would take him to his pediatrician the next morning.

Barbara testified that she took ANB to the emergency room the next morning. Barbara told nurse practitioner Hines that ANB had a seizure the previous evening. Barbara also told Hines that ANB had a seizure when he was four months old and they were living in New Mexico. Hines observed that ANB was "active, awake, playful, reactive, interactive, reaching for objects, smiling and cooing." Hines also noted that ANB had "a small dry scab" on his nose and an abrasion on his earlobe, which mother reported ANB did to himself. ANB did not have any bruises. The clinic personnel made an appointment for Barbara to take ANB to a neurologist to follow up for the possible seizures.

Barbara also testified that in the evening of that same day, July 9, 2012, Gonzalez called EMS again. ANB was in Barbara's arms when Isaac Olivares, an EMT arrived. According to Olivares, ANB was not breathing. Olivares grabbed ANB and returned to the ambulance to call for backup for a cardiac arrest. While Olivares was working on resuscitation, he noticed a small bruise on ANB's face, bruising on his back, and an older scab on the back of his head. Olivares testified that Barbara told him that ANB had a seizure. Olivares advised the police officers who came to the house that ANB was bruised. The bruising became darker by the time they got to the hospital.

4

ANB was taken to Valley Baptist Medical Center by ambulance on July 9, 2012. Emergency personnel succeeded in resuscitating ANB and started him on breathing support. Dr. Rangasamy Anand, a pediatric intensivist who treated ANB on July 12th and 13th while ANB was in the hospital, was called in while ANB was on life support in pediatric intensive care. Dr. Anand described his diagnoses of ANB as follows:

> The first one, hypoxic ischemic encephalopathy leading to brain death. Means — hypoxic is low oxygen level. Ischemic means poor blood flow, and encephalology is malfunction of the brain leading to death. So this is a condition that is caused by absence of oxygen and blood flow to the brain leading to brain malfunction. Obviously, this was irreversible because it lead to death. multiple skeletal injuries, including skull fractures, bilateral humoral fracture, right clavicle fracture. That means multiple bone injuries that included the skull, bilateral humeral bone, the arm bone on both sides. The baby had fractures of the arms close to the shoulder on both sides that were old and healing and also the collarbone. The right clavicle was fractured and was old and healing. But the skull fractures were not that old. They appeared to be new. Third one, bilateral retinal hemorrhages. Bilateral means both sides. Retinal is back portion lining of the eye. Hemorrhage is bleeding. So the baby had multiple bleeding spots in both eyes as seen by the ophthalmologist and reported by the ophthalmologist. The fourth one is probable nonaccidental trauma. It means that putting all of these together, the most closest explanation of this cause —for the cause of death was an injury that was probably not accidental in nature, so that's why it's nonaccidental.

ANB was pronounced dead on July 13, 2012 at 4 p.m. An autopsy was performed by Dr. Elizabeth Miller to confirm the cause of death. At the time of autopsy, ANB weighed 18 pounds and he was 29 inches long. His height was in the 25th to 50th percentile; his weight was in the 3rd percentile according to Dr. Miller.

Both Barbara and Gonzalez were interviewed by officers who testified to their various statements. Their video statements were admitted and shown to the jury. Barbara acknowledged that she and Gonzalez lied about their relationship with one

another, calling each other cousins. Initially they told similar stories, but after multiple statements, their stories diverged and Gonzalez blamed Barbara for ANB's injuries and denied being present at the apartment.

Trial evidence included letters and phone calls by Gonzalez to Barbara in which he encouraged her to stay strong and continue to deny that he participated in ANB's death. During Gonzalez's counsel's cross-examination of Barbara, Barbara admitted to more than thirty lies she told doctors and the police. She ultimately claimed that she lied to protect Gonzalez because she loved him and was scared of him. In addition, Barbara claimed Gonzalez told her to lie about their relationship, where Gonzalez lived, ANB's seizures, and the cause of ANB's black eye. Barbara admitted that ANB did not have a history of seizures and he was not dropped by his sister. Instead Barbara saw Gonzalez punch ANB in the face on June 1 which caused the bruising on ANB's skull and face and ANB's black eye. Barbara testified that on both July 8 and July 9, she was in the kitchen cooking and ANB and Gonzalez were in the bedroom when ANB stopped breathing or had a "seizure." Barbara tried to get ANB to breathe by blowing into his mouth on July 9 while Gonzalez called EMS at her urging.

Barbara and Gonzalez were separately charged with multiple counts of injury to a child including failure to protect ANB. Barbara ultimately pleaded guilty to multiple counts as part of a plea agreement and received a sentence recommendation of fifteen years' imprisonment, although she had not yet been sentenced at the time of Gonzalez's trial.

The State abandoned multiple counts of the indictment and submitted only counts one, four, and seven.[4]   The jury convicted Gonzalez of all three counts of injury to a child and sentenced him to twenty-five years on count one, forty-five years on count four, and ninety-nine years' imprisonment in the Texas Department of Criminal Justice, Institutional Division.   Gonzalez filed a timely motion for new trial.   The trial court held an evidentiary hearing and then denied the motion.   This appeal followed.

## II.   SUFFICIENCY OF THE EVIDENCE

By his second issue, we understand Gonzalez to challenge the sufficiency of the evidence.   His issue is, "Whether the Texas judiciary erred in ruling that the evidence presented by the state against the Appellant was sufficient in supporting a finding of guilt of capital beyond a reasonable doubt?"   Gonzales's brief does not discuss the elements of injury to a child, nor does he discuss the evidence presented at trial.   Despite the deficiencies in his brief, we review the sufficiency of the evidence.   See TEX. R. APP. P. 38.1; *Bufkin v. State*, 179 S.W.3d 166, 173–74 (Tex. App.—Houston [14th Dist.] 2005),

---

[4] The indictment alleged in pertinent part that Gonzalez intentionally or knowingly caused ANB to suffer serious bodily injury by:

**COUNT I**

 . . . on or about the 3RD DAY OF JUNE, 2012, and anterior to the presentment of this indictment, in the County of Cameron and State of Texas . . . by striking [ANB] on the head with Defendant's foot, or Defendant's hand or an object unknown to the Grand Jury or by throwing [ANB] to the ground,

**COUNT IV**

. . . on or about the 2ND DAY OF JULY, 2012, and anterior to the presentment of this indictment, in the County of Cameron and State of Texas . . . by striking [ANB] on shoulder or arm with Defendant's foot, or Defendant's hand or an object unknown to the Grand Jury or by throwing [ANB] to tile ground,

**COUNT VII**

. . . on or about the 8TH DAY OF July, 2012, and anterior to the presentment of this indictment, in the County of Cameron . . . by striking [ANB] on the head with Defendant's foot, or Defendant's hand or an object unknown to the Grand Jury or by throwing [ANB] to the ground . . . .

7

*aff'd*, 207 S.W.3d 779 (Tex. Crim. App. 2006). "[I]t is the court's prerogative [whether] to insist on unerring compliance with the briefing rules. Where, as here, the court has had no difficulty locating the pertinent portions of the record relating to appellant's [] point of error, it is within the court's discretion to review the point of error." *Bufkin*, 179 S.W.3d at 174.

## A. Standard of Review

"[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *In re Winship*, 397 U.S. 358, 364 (1970). To determine whether there is sufficient evidence to support a criminal conviction, we consider the combined and cumulative force of all admitted evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences therefrom, a jury was rationally justified in finding guilt beyond a reasonable doubt. *Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). When a reviewing court views the evidence in the light most favorable to the verdict, it "is required to defer to the jury's credibility and weight determinations because the jury is the *sole* judge of the witnesses' credibility and the weight to be given their testimony." *Brooks*, 323 S.W.3d at 899 (emphasis in original). "The reviewing court must give deference to the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App.

8

2007) (citing *Jackson*, 443 U.S. at 318–19).   If the record supports conflicting inferences, we presume that the fact finder resolved the conflict in favor of the prosecution and defer to that resolution.   *Garcia v. State*, 367 S.W.3d 684, 686–87 (Tex. Crim. App. 2012); *Brooks*, 323 S.W.3d at 899.

We measure the sufficiency of the evidence supporting a conviction "by the elements of the offense as defined by the hypothetically correct jury charge for the case," applied to the particular facts of the case.   *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)); *see Wheaton v. State,* 129 S.W.3d 267, 271–72 (Tex. App.—Corpus Christi 2004, no pet.). "Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried."   *Malik*, 953 S.W.2d at 240.

## B.     Elements of Injury to a Child

First-degree injury to a child requires proof that the defendant: 1) intentionally or knowingly, 2) causes 3) serious bodily injury or serious mental deficiency, impairment, or injury; to 4) a child, defined to be a person younger than 14 years of age.   TEX. PENAL CODE ANN. § 22.04(a), (e) (West, Westlaw 2017 through 1st C.S.).

"A person acts intentionally or with intent . . . when it is his conscious objective or desire to engage in the conduct or cause the result."   TEX. PENAL CODE ANN. § 6.03(a) (West, Westlaw 2017 through 1st C.S.).   "A person acts knowingly, or with knowledge, with respect to the result of his conduct when he is aware that his conduct is reasonably

9

certain to result." *Id.* § 6.03(b).

"Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *Baldwin v. State*, 264 S.W.3d 237, 242 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd); *see also Lopez v. State*, ⸺ S.W.3d ⸺, 2018 WL 3129467, at *11 (Tex. App.—San Antonio June 27, 2018, no pet.). "As a 'result of conduct' offense '[w]hat matters is that the conduct (whatever it may be) is done with the required culpability to effect the *result* the Legislature has specified.'" *Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994) (emphasis in original) (quoting *Alvarado v. State*, 704 S.W.2d 36, 39 (Tex. Crim. App. 1986)).

The jury may infer the requisite intent from any facts which tend to prove its existence, including the acts, words, and conduct of the accused, and the circumstances of the crime. *See Lopez*, 2018 WL 3129467, at *11; *Adams v. State*, 180 S.W.3d 386, 414 (Tex. App.—Corpus Christi 2005, no pet.). In nearly all cases, intent must be established by circumstantial evidence. *See Dillon v. State*, 574 S.W.2d 92, 94 (Tex. Crim. App. [Panel Op.] 1978); *see also Trevino v. State*, 228 S.W.3d 729, 736 (Tex. App.—Corpus Christi 2006; pet. ref'd); *Adams,* 180 S.W.3d at 414.

## C.    Discussion

A challenge to the sufficiency of the evidence requires the court to examine the sufficiency of the evidence as to each element. *Poindexter v. State*, 153 S.W.3d 402, 405 (Tex. Crim. App. 2005) (citing *Jackson*, 443 U.S. at 318–19).

## 1. Evidence of Intent

Gonzalez's daughters each testified that they saw their father strike ANB with his hand, kick him, and step on him. The older child, DG, testified that Gonzalez was mean to ANB because Gonzalez "did not like him." The child demonstrated to the jury how Gonzalez kicked and stepped on ANB. The younger child, NG, testified that she saw Gonzalez throw ANB onto the floor and step on him.

Several experts testified regarding the causes of and extent of ANB's injuries. Dr. Clay Padginton, a radiologist who read the various imaging studies performed on ANB, testified that on July 9, 2012, ANB had two skull fractures, one on the back and one on the right side that resulted in bleeding in ANB's brain caused by his brain slapping against the inside of his skull. He also discussed the CAT scans that showed ANB had a broken shoulder blade, rib fractures in the back, and bruises to his lungs. According to Dr. Padginton, shoulder blades are very difficult to break, especially in infants because their bones are very pliable. ANB also had fractures of both humerus bones that were at least two weeks old. The rib fractures were new and likely occurred about the same time as the skull fractures. Rib fractures in the back are also very rare "outside of nonaccidental trauma." Dr. Padginton described studies that were performed on children who had undergone CPR, and none had a posterior rib fracture. The lung bruising that resulted in bleeding in ANB's lungs was also a result of trauma. Dr. Padginton further testified that any of these injuries could have been caused by "any sort of blunt force trauma; whatever. Foot, hand, bat, brick; you name it." He also testified that throwing a baby to the floor would also qualify.

Dr. Taw, another radiologist, testified about ANB's cranial CAT scan taken on June 3, 2012 that reflected "extensive soft tissue swelling, more on the left than the right, but there was no bleeding into the brain." Dr. Taw also reviewed films taken on July 9, 2011 and testified that there were new fractures and intercranial bleeding that were not present on June 3.

Dr. Rohit Adyanthaya, a retinal specialist, testified to his exam of ANB on July 11, 2012 while ANB was at Valley Baptist. Both of ANB's eyes showed evidence of severe bleeding with hemorrhages in front of the retina, on the nerve of the retina, and hemorrhages on the retina itself that was less than a month old. That kind of hemorrhaging is "highly suggestive of nonaccidental head trauma."

Dr. Harrell Gill-King, a forensic anthropologist who studies bones and decomposed human remains, testified regarding the cause and manner of ANB's death. Dr. Gill-King reviewed various studies of ANB's bones consisting of x-rays, CAT scans, post-autopsy x-rays, and microscope slides. Dr. Gill-King testified that the fractures to the right and left humerus likely occurred at different times, based upon their healing progress. ANB also had a healing fracture to his collarbone, a full-thickness fracture through both tables of the skull that occurred very shortly before the time of death, unlike the earlier fractures of ANB's arms and collarbone. ANB also had fractures on both sides of the spine that appeared in the autopsy films but were not present in previous films.

Dr. Miller, the forensic pathologist who performed ANB's autopsy, testified that ANB died of blunt force head trauma. When she examined ANB during the autopsy, she found numerous bruises and scabbed lesions in addition to the fractures and other bone

and head injuries other witnesses described. Dr. Miller opined that the skin lesions and scabs were likely caused by hard pinching that would have broken the skin. ANB had bruises on his left cheek and two smaller bruises closer to his chin. He had a faint red contusion in the middle of his forehead. Dr. Miller described two scars on the back of his head, one of which still had a scab attached, and multiple curved scabs, as well as a faint greenish bruise that encircled ANB's right shoulder. ANB had "multiple areas of pale scars on his neck." Dr. Miller also testified that the scabbed over abrasion to the back of ANB's head was the external site of the fracture that resulted in his death, "the injury that caused the fracture in this part of the skull resulted in an almost immediate loss of consciousness and brain swelling that eventually led to brain death." Dr. Miller testified that due to the pliability of an infant's skull, "it takes up to 35 times as much impact to deform the skull of a baby than it does an adult."

Based upon the testimony of the children who saw Gonzalez throw ANB to the ground, strike him, step on him, and the force necessary to cause the injuries described by the various physicians, we hold there is sufficient evidence of Gonzalez's intent to cause serious bodily injury to ANB. *See Bowen v.* State, 640 S.W.2d 929, 932 (Tex. Crim. App. [panel op.] 1982) ("[T]he circumstantial evidence is sufficient to support the trial court's findings of appellant's specific intent, as well as his acts which caused the death of the child."); *Alexander v. State*, 229 S.W.3d 731, 740 (Tex. App.—San Antonio 2007, pet. ref'd) ("The degree of force used . . . and the fact that vulnerable areas like the head and abdomen were targeted, are also supportive of an inference that [the defendant] intentionally or knowingly killed [the child] and [defendant] was not merely intending to

13

discipline her."); *Duren*, 87 at 726 (holding evidence sufficient to find defendant guilty of capital murder of child);[5] *see also Cervera v. State*, No. 04-11-00875-CR, 2012 WL 4810318, at \*4 (Tex. App.—San Antonio 2012, no pet.) (mem. op., not designated for publication) (holding circumstantial evidence of amount of force necessary to cause the child's injuries and subsequent death along with other circumstantial evidence was sufficient).

### 2. Evidence of Causation

The jury was asked whether Gonzalez intentionally or knowingly caused serious bodily injury to ANB on or about June 2, 2012, July 2, 2012, and July 8, 2012 as charged in counts one, four, and seven of the indictment.

The medical evidence discussed in Part II(C) supported a finding that Gonzalez intentionally or knowingly caused ANB's injuries by non-accidental trauma, either by striking, stepping on, kicking, or throwing ANB against a wall or floor.

---

[5] *Duren v. State* involved the death of a three-year-old child from severe head trauma. 87 S.W.3d 719, 726 (Tex. App.—Texarkana 2002, no pet.). Duren challenged the sufficiency of the evidence of intent. The court of appeals held the evidence was sufficient based upon the following:

> Dr. Duval's testimony regarding the force necessary to inflict the injuries [the child] sustained, her conclusion that such injuries could not have been inflicted by accident while roughhousing or due to a trivial fall at home, Duren's inconsistent stories, and the disparity between Duren's and [the child]'s size and strength combine to support the reasonable inference that Duren knew his conduct was reasonably certain to cause death. The jury was free to reconcile any conflicting testimony regarding the amount of force required to inflict [the child]'s injuries in favor of such testimony that suggested such enormous force was required that anyone inflicting such force on a child must know that death is reasonably certain to result.

*Id.*

14

### 3. Serious Bodily Injury

Serious bodily injury is defined as "bodily injury that creates a substantial risk of death or that causes death, a serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." TEX. PENAL CODE ANN. § 1.07(a)(46) (West, Westlaw through 2017 1st C.S.). "In determining whether bodily injury is serious, the jury may apply its common sense, knowledge, and experience gained in the ordinary affairs of life as it draws reasonable inferences from the evidence." *Eustis v. State*, 191 S.W.3d 879, 883–84 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd); *see also Castro v. State*, No. 12-14-0080-CR, 2016 WL 900749, at * 7 (Tex. App.—Tyler Mar. 9, 2016, pet. ref'd) (mem. op., not designated for publication). "'Serious bodily injury' may be established without a physician's testimony when the injury and its effects are obvious." *Sizemore v. State*, 387 S.W.3d 824, 828 (Tex. App.—Amarillo 2012, pet. ref'd). "[T]he relevant inquiry is the degree of risk posed by the injury as it was inflicted without regard to the positive effects of medical treatment." *Blea v. State*, 483 S.W.3d 29, 34-35 (Tex. Crim. App. 2016).

Count one involved injuries to ANB's head on or about June 3, 2012.[6]  Barbara testified that she saw Gonzalez punch ANB in the face on or about June 1.   Although the girls did not know dates, both of Gonzalez's daughters testified that they saw Gonzalez strike ANB with his hands.   On June 3, 2012, Barbara took ANB for medical care.   ANB's scalp and face were swollen.   The CAT scan reflected that injury as did the medical

---

[6] "It is well settled that the 'on or about' language of an indictment allows the State to prove a date other than the one alleged in the indictment as long as the date is anterior to the presentment of the indictment and within the statutory limitation period."   *See* TEX. CODE CRIM. PROC. ANN. art. 21.02(6) (West, Westlaw through 2017 1st C.S.); *Scoggan v. State*, 799 S.W.2d 679, 680 n.3 (Tex. Crim. App. 1990).

records and testimony from nurse practitioner Kirkland who treated ANB.[7] Dr. Taw who reviewed ANB's CAT scan testified that it showed "trauma at that time with extensive soft tissue swelling, and the soft tissue swelling is more on the left than the right." Dr. Taw opined that the amount of swelling he saw likely would have caused ANB pain. Barbara testified that ANB's eye was swollen shut and he could not see out of that eye for at least two to four days.

Depending on the strength and repetitiveness of the blows to a person's head, such blows can but do not necessarily always result in a "serious bodily injury" as the term is defined by the penal code. *See Sanchez v. State*, 543 S.W.2d 132, 134 (Tex. Crim. App. 1976). Serious bodily injury as defined by statute requires a risk of death, permanent disfigurement, or protracted loss of impairment or function. *See* TEX. PENAL CODE ANN. § 1.07(a)(46) (West, Westlaw 2017 through 1st C.S.). ANB's eye was swollen shut and he could not see out of it for two to four days. The swelling on his head and scalp was also extensive.

Count four relates to injuries to ANB's shoulder that occurred on or about July 2, 2012. ANB's shoulder-blade was fractured sometime after June 2, 2012, and before July 2, 2012. ANB received medical care on July 2 for a healing fracture to his clavicle. According to nurse practitioner Hines, by history ANB was crawling at four months but does not now crawl. Hines observed that ANB "keeps left arm close to body and hand bent at wrist. Mom says he cries when lifted underarms" and that ANB did not reach for

---

[7] Medical records from July 3, 2012 reflect, "Differential diagnosis: Anterior dislocation without fracture, Posterior dislocation without fracture, humeral head fracture, clavicle fracture."

objects in front or to the side and did not raise his arm from the shoulder level.

Dr. Anand testified that ANB had healing fractures to his arms (bilateral humoral fractures), a right clavicle fracture, and a collarbone fracture. According to Dr. Anand, the fractures would have impaired ANB's use of his arms and would have been painful. None of these injuries were observed five weeks earlier when ANB was seen by nurse practitioner Kirkland.

Dr. Miller performed ANB's autopsy on July 16, 2012. At that time, ANB's right shoulder was still showing signs of hemorrhage and healing fractures of the right humerus, clavicle, and scapula. According to Dr. Miller, these injuries constituted serious bodily injury due to the impairment of ANB's use of his arm. Because ANB died within ten days after the diagnosis of his shoulder injuries, we do not know how long it would have taken him to regain his ability to use his right arm. However, there is evidence of hemorrhage and bones that were healing more than two weeks after these injuries were initially diagnosed.

Count seven relates to the injuries to ANB's head on or about July 8, 2012. The medical evidence showed that the injuries to ANB's head resulted in severe retinal hemorrhaging and two skull fractures and those injuries caused ANB's death.

"[W]e must determine whether an injury constitutes a serious bodily injury on a case-by-case basis, evaluating each case on its own facts to determine whether the evidence was sufficient to permit the factfinder to conclude that the injury fell within the definition of 'serious bodily injury.'" *Moore v. State*, 739 S.W.2d 347, 352 (Tex. Crim. App. 1987). Accordingly, we have considered other cases. *See e.g., Jackson v. State*,

399 S.W.3d 285, 291 (Tex. App. —Waco 2013, no pet.) (holding that evidence that skin was torn off child's toes which impaired the use of his foot and his injury impaired the use of his dominant hand for at least three days constituted sufficient evidence of serious bodily injury); *Taylor v. State*, 71 S.W.3d 792, 795–96 (Tex. App.—Texarkana 2002, pet. ref'd) (holding that evidence of a dislocated toe that prevented walking until after medical treatment was sufficient to support finding of serious bodily injury); *Madden v. State*, 911 S.W.2d 236, 244–45 (Tex. App.—Waco 1995, pet. ref'd) (holding that evidence was sufficient to demonstrate a "protracted impairment of a bodily member" when complainant was shot in the hip and could not walk for three to four weeks); *Botello v. State*, 693 S.W.2d 528, 530 (Tex. App.—Corpus Christi 1985, pet. ref'd) (holding evidence that the complaining witness could no longer use his hand as well as before he was beaten was sufficient to support a conviction for aggravated assault); *see also Johnson v. State*, No. 05-10-00465-CR, 2011 WL 3484801, at *4 (Tex. App.—Dallas 2011, no pet.) (mem. op., not designated for publication) (concluding "a rational jury could have concluded complainant's inability to use her eye for three weeks constituted protracted loss or impairment of that eye."); *Rogers v. State,* No. 01-02-01024-CR, 2004 WL 253265, at *4 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (mem. op., not designated for publication) (holding that complainant's loss of sight for two weeks with full vision not returning for a month constituted sufficient evidence of serious bodily injury).

Based upon our review, the evidence was sufficient for a rational jury to find ANB sustained serious bodily injury on all three counts. Gonzalez's second issue challenging the sufficiency of the evidence is overruled.

18

### III. PRIOR BAD ACTS

By his first issue, Gonzalez claims the "Texas judiciary erred in ruling that the trial court properly admitted 404(b) evidence" in violation of his Fifth and Fourteenth Amendment rights. However, Gonzalez's brief does not cite to the record where the alleged error occurred, nor does he describe the alleged error in more detail than quoted above. The State argues that Gonzalez waived this issue. *See* TEX. R. APP. P. 38(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."). We consider the issue out of an abundance of caution and at our sole discretion. Our review of the record reveals evidence that Gonzalez struck or threatened Barbara and that Gonzalez had been arrested before the present offenses. Before trial, the trial court excluded evidence that Gonzalez struck or threatened Barbara, evidence that Gonzalez had previously been arrested, and evidence that he was on probation.

We review the trial court's admission or exclusion of evidence for an abuse of discretion. *Montgomery v. State*, 810 S.W.2d 372, 379–80 (Tex. Crim. App. 1990); *Rivera v. State*, 130 S.W.3d 454, 460 (Tex. App.—Corpus Christi 2004, no pet.). An abuse of discretion occurs when the trial court acts arbitrarily or unreasonably, without reference to guiding rules or principles. *Montgomery*, 810 S.W.2d at 380.

Adam Bravo, ANB's father, testified that Barbara told him that she was scared of Gonzalez because Gonzalez threatened her. After Bravo testified to Barbara's statement, the trial court sustained defense counsel's objection on hearsay grounds, denied counsel's motion for mistrial, and instructed the jury to "disregard that answer."

19

Additionally, the trial court ordered the response stricken from the record.

Later, during the playing of Barbara's video statement to the police, Barbara apparently stated that Gonzalez had a previous arrest. Defense counsel promptly objected, and the jury was excused. While the jury was out, the trial court noted, "I d[id]n't hear what she said. I don't think it hurt you [referring to defense counsel] because what I heard from the young lady, Ms. Bravo, saying was, 'Well, I don't know him.'" Defense counsel advised the trial court that, "She stated he had an arrest in the past." The trial court did not hear that statement, and defense counsel admitted "I did not hear that because I was objecting." Outside the presence of the jury, the parties confirmed nothing more on the tape was problematic and they would fast forward through the problematic section when court resumed with the jury. No instruction was requested, and none was given.

Barbara explained on cross-examination that Gonzalez threatened her, and she lied to the authorities to protect Gonzalez because of those threats and because she loved him. The trial court allowed that testimony, but instructed the jury as follows:

> All right. Ladies and gentlemen, regarding Defense Exhibit K, this is a statement by Ms. Bravo with the Texas Rangers. And in this statement, which has been read by Ms. Bravo into the record, and to you, as evidence, Ms. Bravo talks about different allegations that she's made against Mr. Jesus Gonzalez regarding him, for example, holding her against the throat and threatening her. I want to remind you that you are to consider this for the sole purpose of Ms. Bravo's state of mind. You decide, as the jury of this Court, what weight you give to Exhibit K as you do with all other evidence. You're not to take this Exhibit K and use it in deciding to convict him or not. It's not – you're not convicting him of whether he assaulted Ms. Bravo or not. He's here for you to decide if he's guilty or not guilty of causing serious bodily injury of [ANB] the child, 11-month old child, not anything that he may or may not have done to Ms. Bravo. Do you understand my instruction?

20

JURY PANEL: Yes.

. . .

THE COURT: Yeah. And the same would apply to any of the evidence in the case — Exhibit —the transcript — well, to all of the evidence that is in this record.

In addition, the jury charge instructed that:

The court has allowed some evidence before you, the jury, in order for you to consider a witness's state of mind. In the event that said evidence accuses the defendant, Jesus Gonzalez, of a different crime or bad act you are instructed not to use such evidence in determining whether or not the defendant is guilty or not guilty as charged in each of the three counts of the indictment.

An instruction to disregard extraneous offenses can be curative "unless [] the evidence was so clearly calculated to inflame the minds of the jury or is of such damning character as to suggest it would be impossible to remove the harmful impression from the jury's mind.'" *Stine v. State*, 300 S.W.3d 52, 58–59 (Tex. App.—Texarkana 2009, pet. dism'd) (quoting *Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992)). In deciding whether an instruction is sufficient, a reviewing court considers several factors: "(1) the weight of other evidence supporting the decision; (2) nature and form of the question; (3) whether other evidence concerning the same subject has been admitted; (4) the particular instruction given, and (5) the harm to the accused as measured by the severity of the sentence." *Id.*

We presume that juries follow the law as instructed by the trial judge and consider only what the judge allows them to consider. *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005); *see Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998); *see also Elliott v. State*, No. 13-05-00227-CR, 2006 WL 2025146, at *1 (Tex. App.—

21

Corpus Christi 2006, pet. dism'd) (mem. op., not designated for publication). This presumption may be rebutted, but only by evidence that the jury disregarded the judge's instructions. *See Thrift*, 176 S.W.3d at 224; *Colburn,* 966 S.W.2d at 520. Only when "the facts of the case suggest the impossibility of removing the impression produced on the minds of the jury" is an instruction to disregard insufficient to cure the error. *Waldo v. State*, 746 S.W.2d 750, 754 (Tex. Crim. App. 1988).

The evidence at issue was a very small part of this two-week trial. The trial court promptly instructed the jury and also included a limiting instruction in the jury charge. Gonzalez references no evidence that the jury disregarded the trial court's limiting instructions, and we have seen none in the record. Gonzalez's first issue is overruled.

## IV.    EXCESSIVE PUNISHMENT

Gonzalez challenged his concurrent sentences of twenty-five, forty-five, and ninety-nine years' imprisonment as excessive in violation of the Eighth Amendment and argues that the trial court erred by failing to consider mitigation evidence. *See* U.S. CONST. amend. VIII. As with his other issues, Gonzalez's counsel does not cite to the record, nor does this portion of his brief bear any relationship to the facts of this case. Instead, the brief talks about capital and juvenile sentencing, neither of which are at issue.[8]

During punishment, the State called two probation officers who had previously supervised Gonzalez. Both testified regarding Gonzalez's violations of the terms of his probation and his misrepresentations to them. Gonzalez's counsel presented evidence

---

[8] Gonzalez was twenty-nine years old at the time of the offense.

from his family, his fiancée (not Barbara), and evidence of his work history. Gonzalez put on no evidence of mitigation separate from the testimony of his family and fiancée that they loved him, and they believed him to be a good person. After the jury returned its punishment verdict, there was no objection to the jury's finding at sentencing. The motion for new trial did not address Gonzalez's sentence.

Gonzalez was sentenced in count one to twenty-five years' imprisonment, in count four to forty-five years, and in count seven to ninety-nine years for the intentional or knowing serious bodily injury to ANB. The penalty range for first-degree injury to a child was probation, five years to ninety-nine years' or life imprisonment. TEX. PENAL CODE ANN. § 12.32 (West, Westlaw 2017 through 1st C.S.). The jury's punishment findings were within the statutory ranges.

To preserve error for appellate review, a party must present a timely objection to the trial court, state the specific grounds for the objection and obtain a ruling. TEX. R. APP. P. 33.1(a). Even constitutional claims may be waived by a party's failure to make a timely and specific objection. *Smith v. State*, 721 S.W.2d 844, 855 (Tex. Crim. App. 1986).[9] Error, if any, was not preserved. Gonzalez's third issue is overruled.

---

[9] *See also Arriaga v. State*, 335 S.W.3d 331, 334 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (upholding life sentence for aggravated sexual assault of child against Eighth Amendment challenge where appellant failed to object to trial court); *Ajisebutu v. State*, 236 S.W.3d 309, 311–13 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (holding Texas constitutional argument waived by defendant's failure to object); *Trevino v. State*, 174 S.W.3d 925, 927–28 (Tex. App.—Corpus Christi 2005, pet. ref'd) (holding Eighth Amendment argument was waived where sentence was in statutory punishment range, and defendant failed to object); *Solis v. State*, 945 S.W.2d 300, 301 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd) (holding appellant waived Eighth Amendment arguments by failing to object).

## V.    Conclusion

We affirm the judgment of the trial court.

GINA M. BENAVIDES,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
1st day of November, 2018.